NO. 23-12742

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

IDA ADAMS, *et al.*,

*Plaintiffs-Appellants*

v.

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., *et al.*,

*Defendants-Appellees*

On Appeal from the United States District Court
for the Southern District of Florida
MDL No. 2924

## ECONOMIC LOSS AND MEDICAL MONITORING PUTATIVE CLASS PLAINTIFFS-APPELLANTS' OPENING BRIEF

Robert C. Gilbert
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Blvd, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270
gilbert@kolawyers.com

April 10, 2024

Ashley Keller
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5222
ack@kellerpostman.com

Zachary Clark
Noah Heinz
KELLER POSTMAN LLC
1101 Connecticut Avenue NW
Suite 1100
Washington, DC 20036
zachary.clark@kellerpostman.com
noah.heinz@kellerpostman.com

*Counsel for Plaintiffs-Appellants*

No. 23-12742
*Adams v. Boehringer Ingelheim Pharmaceuticals, Inc.*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Plaintiffs-Appellants Ida Adams, *et al.*, hereby certifies that the previously filed Certificate of Interested Persons remains correct, with the addition of the following persons or entities:

- Zachary Clark – Counsel for Plaintiffs-Appellants

Dated:  April 10, 2024                      Respectfully submitted,

                                            /s/ *Ashley Keller*
                                            Ashley Keller
                                            KELLER POSTMAN LLC
                                            150 N. Riverside Plaza, Suite 4100
                                            Chicago, IL  60606
                                            Tel: (312) 741-5220

                                            *Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument because this appeal arises from a complex and lengthy multidistrict litigation proceeding involving multiple, distinct putative class actions and individual plaintiffs with differing claims and injuries. The district court's order at issue in this appeal relies on developments that took place over the course of years in these proceedings and the relationships between the distinct claims brought by different groups of plaintiffs. Oral argument would therefore assist the Court in understanding and clarifying the record, the basis for the district court's order, and the parties' arguments on appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS........................................................................... i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER

     PARTIES .................................................................................. ix

STATEMENT OF JURISDICTION.........................................................x

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE CASE................................................................5

     A.    Ranitidine Products Degrade into Toxic NDMA.................................5

     B.    The Ranitidine Manufacturers Knew or Should Have Known

           that Ranitidine Products Degrade into NMDA But Sold Them

           for Billions Anyway .............................................................6

     C.    The Truth Becomes Public and Ranitidine Products Are

           Recalled ............................................................................7

     D.    Consumers File Suit for the Ranitidine Manufacturers'

           Deception..........................................................................8

E.    The District Court Dismisses Claims Against Manufacturers of
      Generic Ranitidine Products as Preempted by Federal Law...............10

F.    The District Court Holds that the Economic Loss Plaintiffs
      Have Standing ....................................................................................11

G.    The District Court Improperly Excludes Plaintiffs' Experts'
      Opinions on General Causation and Grants Summary Judgment
      Against the Personal Injury Plaintiffs .................................................12

H.    The District Court Issues Show Cause Orders as to the Medical
      Monitoring and Economic Loss Plaintiffs' Claims............................13

I.    The District Court Dismisses the Economic Loss Plaintiffs for
      Lack of Standing and Enters Summary Judgment Against the
      Medical Monitoring Plaintiffs.............................................................16

STANDARD OF REVIEW ...................................................................................17

SUMMARY OF ARGUMENT ..............................................................................18

ARGUMENT ........................................................................................................20

I.    The District Court Erred By Dismissing The Economic Loss Plaintiffs
      For Lack Of Standing ...................................................................................20

      A.    The Economic Loss Plaintiffs Have Standing Because They
            Suffered Monetary Harm ....................................................................23

B.     The District Court Erred by Conflating the Economic Loss

Plaintiffs' Standing with the Merits ......................................................29

C.     The District Court Erred by Applying a Heightened Burden of

Proof ......................................................................................................34

D.     Even if the District Court Applied the Proper Standing

Framework, the Court Erred in Concluding that the General

Causation Order Established that the Economic Loss Plaintiffs

Were not Injured....................................................................................40

II.   The District Court Erred In Dismissing For Lack of Standing Claims

Brought Under Other States' Laws ..................................................................44

III.   The District Court Erred In Granting Summary Judgment Against The

Medical Monitoring Plaintiffs Based On The General Causation Order ........44

IV.   The District Court Erred In Dismissing Claims Against Generic-Only

Manufacturers As Preempted By Federal Law ...............................................45

CONCLUSION ...........................................................................................................46

CERTIFICATE OF COMPLIANCE .........................................................................47

CERTIFICATE OF SERVICE ..................................................................................48

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Amy v. Carnival Corp.*,

  961 F.3d 1303 (11th Cir. 2020) ............................................................37

*Artistic Ent., Inc. v. City of Warner Robins*,

  331 F.3d 1196 (11th Cir. 2003) ............................................................39

*Carriuolo v. Gen. Motors Co.*,

  823 F.3d 977 (11th Cir. 2016) ..............................................................29

*Chiles v. Thornburgh*,

  865 F.2d 1197 (11th Cir. 1989) ............................................................32

*Claims 1, LLC v. Tenet Fla., Inc.*,

  918 F.3d 1312 (11th Cir. 2019) ............................................................23

*Clements v. LSI Title Agency, Inc.*,

  779 F.3d 1269 (11th Cir. 2015) ............................................................21

*Cordoba v. DIRECTV, LLC*,

  942 F.3d 1259 (11th Cir. 2019) ............................................................20

*Debernardis v. IQ Formulations, LLC,

  942 F.3d 1076 (11th Cir. 2019) ..................................................... 27, 29

Fitzpatrick v. Gen. Mills, Inc.,

  635 F.3d 1279 (11th Cir. 2011) ...............................................................41

*Fox v. Ritz-Carlton Hotel Co.,

  977 F.3d 1039 (11th Cir. 2020) ............................................. 17, 24, 26

Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs,

  775 F.3d 1336 (11th Cir. 2015) ...............................................................38

Garcia-Bengochea v. Carnival Corp.,

  57 F.4th 916 (11th Cir. 2023) ................................................. 21, 23, 30

Hill v. White,

  321 F.3d 1334 (11th Cir. 2003) ...............................................................21

Hunstein v. Preferred Collection & Mgmt. Servs., Inc.,

  48 F.4th 1236 (11th Cir. 2022) ...............................................................23

*In re Evenflo Co. Mktg., Sales Practices & Prods. Liab. Litig.,

  54 F.4th 28 (1st Cir. 2022).............................................................. 27, 28

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*,

    609 F. Supp. 3d 942 (N.D. Cal. 2022)...................................................................41

*\*In re Zantac (Ranitidine) Prods. Liab. Litig.*,

    *21-10335,* 2022 WL 16729170 (11th Cir. Nov. 7, 2022)............ 26, 29, 31, 32, 44

*Lombardo v. Johnson & Johnson Consumer Cos.*,

    124 F. Supp. 3d 1283 (S.D. Fla. 2015)...................................................................41

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992)........................................................................... 20, 21, 34, 35

*Massey v. Congress Life Ins. Co.*,

    116 F.3d 1414 (11th Cir. 1997) ..............................................................................39

*Moody v. Holman*,

    887 F.3d 1281 (11th Cir. 2018) ..................................................................... 30, 31

*Muransky v. Godiva Chocolatier, Inc.*,

    979 F.3d 917 (11th Cir. 2020) ....................................................................... 20, 23

*Oahn Nguyen Chung v. StudentCity.com, Inc.*,

    854 F.3d 97 (1st Cir. 2017).......................................................................................38

*Reid v. Johnson & Johnson*,

    780 F.3d 952 (9th Cir. 2015) ...............................................28

*Rensel v. Centra Tech., Inc.*,

    2 F.4th 1359 (11th Cir. 2021) ...............................................39

*Resnick v. AvMed, Inc.*,

    693 F.3d 1317 (11th Cir. 2012) ................................... 21, 23

*Saladin v. City of Milledgeville*,

    812 F.2d 687 (11th Cir. 1987) ...............................................33

*Salcedo v. Hanna*,

    936 F.3d 1162 (11th Cir. 2019) ...........................................33

*Spokeo, Inc. v. Robins*,

    578 U.S. 330 (2016)...............................................................21

*Steel Co. v. Citizens for a Better Env't*,

    523 U.S. 83 (1998).......................................................... 29, 32

*TransUnion LLC v. Ramirez*,

    141 S. Ct. 2190 (2021)...........................................................23

*United States ex rel. Sanchez v. Lymphatx, Inc.*,

   596 F.3d 1300 (11th Cir. 2010) ..............................................................17

*Warth v. Seldin*,

   422 U.S. 490 (1975)...........................................................................30

*West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*,

   59 F.4th 1124 (11th Cir. 2023) .............................................................30

*Williams v. Mosaic Fertilizer, LLC*,

   889 F.3d 1239 (11th Cir. 2018) ............................................................17

*Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*,

   247 F.3d 1262 (11th Cir. 2001) ............................................................30

**Statutes**

Fla. Stat. Ann. § 501.201 .........................................................................41

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

The Medical Monitoring Plaintiffs adopt Part II of the Personal Injury Plaintiffs' opening brief in appeal No. 23-13283 arguing that the district court erred in excluding expert testimony on the issue of general causation and granting summary judgment on that basis. The Economic Loss and Medical Monitoring Plaintiffs adopt Parts II and III of the Generic-Only Plaintiffs' opening brief in appeal No. 21-12618 that explain how the district court erred in dismissing certain claims based on preemption.

## STATEMENT OF JURISDICTION

The district court had federal subject-matter jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because (a) there are at least 100 class members in the putative classes; (b) the matter in controversy exceeds $5 million; and (c) at least one Plaintiff is a citizen of a different state than at least one Defendant. This Court has appellate jurisdiction under 28 U.S.C. § 1291, as this appeal arises from a final order and final judgment entered on July 26, 2023. D.E. 6795; D.E. 6795-3.[1] Appellants timely filed their notices of appeal in the district court on August 22, 2023. D.E. 6926; D.E. 6927.

---

[1] This brief refers to docket entries in the MDL docket below as "D.E."

## INTRODUCTION

N-Nitrosodimethylamine ("NDMA") is a toxic chemical and carcinogen used to induce tumors in animal experiments. NDMA serves no medical purpose whatsoever. Yet NDMA was found in over-the-counter and prescription heartburn medication Zantac and its generic equivalent ranitidine (together, "Ranitidine Products") that were sold across the globe for decades.

When the Food and Drug Administration learned from independent scientists in late 2019 that Ranitidine Products degrade into NDMA, the FDA recalled all Ranitidine Products that contained unacceptable levels of NMDA. Soon after that, the FDA concluded that no Ranitidine Products were safe and ordered all Ranitidine Products withdrawn from the market.

Defendants Boehringer Ingelheim Pharmaceuticals, Inc., GlaxoSmithKline LLC, Pfizer Inc., Sanofi-Aventis U.S. LLC, and their related entities (together, "Ranitidine Manufacturers") manufactured, distributed, and sold Ranitidine Products. The Ranitidine Manufacturers knew, or reasonably should have known, that Ranitidine Products degraded into toxic NDMA. Yet the Ranitidine Manufacturers did not warn the FDA or public and opted instead to remain silent, promote Ranitidine Products as safe and effective, and make billions of dollars until the truth came out and they stopped selling the Products.

Thousands of lawsuits were filed against the Ranitidine Manufacturers for their deceptive and dangerous conduct and consolidated into the multidistrict litigation proceeding below. The multidistrict litigation included multiple groups of plaintiffs with distinct claims based on different types of injuries. For example, plaintiffs who had ingested Ranitidine Products and developed cancer ("Personal Injury Plaintiffs") sued for their personal injuries. Others who had consumed Ranitidine Products but not yet developed cancer ("Medical Monitoring Plaintiffs") sued for their increased risk of cancer and the additional costs they would incur for necessary medical monitoring. And consumers who purchased Ranitidine Products but would not have done so if the Ranitidine Manufacturers had disclosed the presence of NDMA and the Products' risks ("Economic Loss Plaintiffs") sued to obtain refunds of the money they spent.

During motion to dismiss briefing, the district court rejected a challenge to the Economic Loss Plaintiffs' standing and held that they had suffered an injury in fact because they were deceived into paying money for Ranitidine Products that were worthless due to the presence of NDMA.

But later in the litigation, after excluding under Rule 702 the Personal Injury Plaintiffs' general causation experts' testimony about whether Ranitidine Products cause five specific cancers and entering summary judgment against them, the district court held *sua sponte* that Economic Loss Plaintiffs' wholly separate and distinct

claims must be dismissed for lack of standing. The court's theory was that if the Personal Injury Plaintiffs could not "*prove* that ranitidine" can cause cancer, then the Economic Loss Plaintiffs necessarily cannot prove any monetary injury from buying Ranitidine Products. D.E. 6795 at 28–29 (emphasis added).

The district court's errors are obvious. The court erred as a matter of law by conflating the merits of the Economic Loss Plaintiffs' claims with their standing, failed to assume as required that Plaintiffs' claims have merit, and ignored that whether Ranitidine Products cause cancer is not determinative of their economic value. Further, the Economic Loss Plaintiffs' claims had not even reached the class certification stage, so the district court's dismissal deprived them of their ability to develop evidence of the Ranitidine Products' value through expert discovery. Not to mention that the exclusion of experts in one case does not entail anything for a different case. And the grant of summary judgment on general causation says nothing about economic loss claims that do not require proof of general causation.

At the same time the district court dismissed the Economic Loss Plaintiffs, the court—again relying on the same *Daubert* and summary judgment order addressing the Personal Injury Plaintiffs' claims—granted summary judgment against the Medical Monitoring Plaintiffs because they "do not have proof that they have an increased risk of cancer, and thus, have no basis to request periodic testing for cancer through medical monitoring class action claims." *Id.* at 9–10. That too was

erroneous because, in the General Causation Order, the court disregarded its role as gatekeeper and decided to weigh the evidence itself to conclude that Ranitidine Products could not cause cancer.

The Court should therefore reverse the district court's dismissal of the Economic Loss Plaintiffs and entry of summary judgment against the Medical Monitoring Plaintiffs.

## STATEMENT OF THE ISSUES

1. Whether the district court erred as a matter of law when it dismissed the Economic Loss Plaintiffs for lack of standing because (a) Plaintiffs purportedly could not succeed on the merits of their claims; (b) Plaintiffs had not submitted evidence of their injuries even though the case was still at the pleading stage, the district court had not given notice Plaintiffs needed to submit such evidence, and class certification expert discovery had not yet occurred; and (c) the court relied on the General Causation Order that did not address whether Plaintiffs overpaid for the Ranitidine Products they purchased and therefore suffered any injury.

2. Whether district court erred in dismissing for lack of standing claims brought by the Economic Loss and Medical Monitoring Plaintiffs under certain states' laws because no named plaintiff resided or purchased Ranitidine Products in those states.

3.     Whether the district court abused its discretion in excluding the general causation experts' opinions that Ranitidine Products can cause cancer and, in turn, erred as a matter of law in relying on that determination to enter summary judgment against the Medical Monitoring Plaintiffs.

4.     Whether the district court erred in dismissing certain of the Economic Loss and Medical Monitoring Plaintiffs' claims as preempted by federal law.

## STATEMENT OF THE CASE

### A.     Ranitidine Products Degrade into Toxic NDMA

NDMA is a known carcinogenic chemical that has no use today aside from causing cancer in laboratory animals.  D.E. 3883 ("Second Amended Economic Loss Compl.") ¶¶167, 169–70.[2] Numerous health agencies classify it as a probable human carcinogen.  *See, e.g.*, *id.* ¶¶168, 171, 173, 175, 178 (Environmental Protection Agency, International Agency for Research on Cancer, Department of Health and Human Services, World Health Organization, European Medicines Agency, and Occupational Safety and Health Administration).  The FDA, for example, "considers NDMA a carcinogenic impurity" that is "known to be toxic."  *Id.* ¶172.  Accordingly, the FDA sets an "acceptable daily intake" level for NDMA.  *Id.* ¶192.

---

[2] Because of the issues presented in this appeal, citations are to the Second Amended Economic Loss Complaint. The Amended Consolidated Medical Monitoring Complaint (D.E. 3884), however, contains similar, if not identical, allegations for the Medical Monitoring Plaintiffs' claims.

NDMA's carcinogenic properties are not the chemical's only dangerous feature. NDMA is a genotoxin that "interacts with DNA and may subsequently induce mutations." *Id.* ¶191; *see also id.* ¶¶198, 210. "Genotoxins are not considered to have a safe threshold or dose." *Id.* ¶191. Exposure to high levels of NDMA has also been linked to liver damage, exacerbation of dormant tumor cells, and suppression of the human body's ability to fight cancer. *Id.* ¶¶197, 211.

Ranitidine Products become NDMA as the ranitidine molecule degrades into NDMA. *Id.* ¶¶233–34. This degradation can occur under many different, common conditions. For example, Ranitidine Products can degrade into NDMA in a person's stomach if consumed with nitrite-containing foods (*e.g.*, processed meats); exposed to heat during shipping, handling, or storage; or stored at room temperature for an extended period of time. *Id.* ¶¶223, 226–27, 229; *see also id.* ¶¶236–37, 257–77.

**B.   The Ranitidine Manufacturers Knew or Should Have Known that Ranitidine Products Degrade into NMDA But Sold Them for Billions Anyway**

The Ranitidine Manufacturers designed, manufactured, tested, marketed, labeled, stored, and sold Ranitidine Products. Second Amended Economic Loss Complaint ¶141. Zantac, in particular, received FDA approval in 1983 and became a "blockbuster" product, *i.e.*, the first prescription drug in history to reach $1 billion in sales. *Id.* ¶147.

The Ranitidine Manufacturers' internal documents show that they have been aware "for over 40 years that NDMA is toxic and a known carcinogen." *Id.* ¶179; *see also id.* ¶294. They also knew or should have known that Ranitidine Products would degrade into NDMA under common conditions like when taken with nitrite-containing foods. *Id.* ¶¶296, 301–03, 310.

The Ranitidine Manufacturers nevertheless continued to market and promote Ranitidine Products as safe and effective and did not take any action to warn regulators or consumers of the NDMA in their Products, including by failing to report any risks to the FDA. *Id.* ¶¶254, 303, 305–06. The Ranitidine Manufacturers never proposed any changes to Ranitidine Products that would have addressed these risks, such as updating the label for Ranitidine Products or changing storage and transportation guidelines. *Id.* ¶311. The Ranitidine Manufacturers thus failed to disclose the high levels of NDMA in Ranitidine Products to consumers. *Id.* ¶324.

### C. The Truth Becomes Public and Ranitidine Products Are Recalled

In September 2019, an independent pharmacy and testing laboratory filed a Citizen Petition calling for the recall of Ranitidine Products after detecting high levels of NDMA in the Products. Second Amended Economic Loss Complaint ¶212. In response, many Ranitidine Manufacturers and nonparty manufacturers voluntarily recalled their Ranitidine Products from store shelves. *See, e.g.*, *id.* ¶¶214–16, 218–221.

In November 2019, the FDA announced further testing results and found "unacceptable levels of NDMA" in Ranitidine Products and asked drug makers to voluntarily recall their Products if the FDA or manufacturers found NDMA above acceptable limits. *Id.* ¶222. Even more drug makers then recalled their Ranitidine Products due to NDMA concerns. *Id.* ¶225. In April 2020, the FDA asked manufacturers to voluntarily recall Ranitidine Products because they "present[] a serious health risk." *Id.* ¶228; *see also id.* ¶312.

### D. Consumers File Suit for the Ranitidine Manufacturers' Deception

Following the public disclosure that Ranitidine Products degrade into NDMA, thousands of consumers filed suit against the Ranitidine Manufacturers and those cases were consolidated into the multidistrict litigation proceeding below.

One group of plaintiffs were the Personal Injury Plaintiffs who had ingested Ranitidine Products and developed cancer. The Personal Injury Plaintiffs asserted that Ranitidine Products caused their cancers. D.E. 3887.

Another group of plaintiffs consisted of the Economic Loss Plaintiffs who had purchased Ranitidine Products and sought a refund or reimbursement. The Economic Loss Plaintiffs alleged that they had purchased Ranitidine Products but would not have done so had the Ranitidine Manufacturers fully informed them of the facts about Ranitidine Products, including that they contained elevated levels of NDMA. Second Amended Economic Loss Complaint ¶323; *see, e.g., id.* ¶422.

Plaintiffs alleged that the Ranitidine Products they purchased were, among other things, misbranded and adulterated for a host of reasons—including because the Products contained NDMA that was not on the Products' labels, approved by the FDA, or disclosed. *See, e.g.*, *id.* at 13, ¶¶347–98. The Economic Loss Plaintiffs asserted state law claims including violation of state statutes prohibiting deceptive and unfair practices, unjust enrichment, and breach of warranties. The Economic Loss Plaintiffs sought to proceed as a class. *Id.* ¶¶333–46.

A third group of plaintiffs were the Medical Monitoring Plaintiffs— consumers who used Ranitidine Products that transformed into NDMA but who had not yet developed cancer. D.E. 3884.[3] The Medical Monitoring Plaintiffs regularly consumed Ranitidine Products designed, made, and/or sold by the Ranitidine Manufacturers and were therefore at a significantly increased risk of cancer. *Id.* ¶¶383–86, 411–12. Because of that increased risk, they required medical monitoring and testing for various cancers. *Id.* ¶¶411–56. The Medical Monitoring Plaintiffs asserted various claims generally related to the Ranitidine Manufacturers' negligence and failure to warn, and they sought to recover the costs of medical surveillance. Like the Economic Loss Plaintiffs, the Medical Monitoring Plaintiffs sought to pursue their claims as a class action. *Id.* ¶¶463–476.

---

[3] Early in the litigation, the district court ordered that the plaintiffs employ different "master" complaints for those plaintiffs asserting personal injury claims and those with class action claims. D.E. 875 at 3; D.E. 876.

**E.     The District Court Dismisses Claims Against Manufacturers of Generic Ranitidine Products as Preempted by Federal Law**

Early on in the litigation below, when the Economic Loss Plaintiffs and Medical Monitoring Plaintiffs claims were brought in the same complaint, D.E. 889, the defendants who manufactured only generic Ranitidine Products moved to dismiss claims against them as preempted by federal law. D.E. 1582. The generic defendants argued that federal law prevented them from changing the design or label of the Ranitidine Products they sold without pre-approval from the FDA. Plaintiffs responded that federal and state law were in harmony, as both legal regimes forbid the sale of misbranded, dangerous drugs. D.E. 1978. The district court granted the motion. D.E. 2512.

Addressing a separate motion to dismiss, the district court dismissed Plaintiffs' putative class claims "brought under the laws of Delaware, Hawaii, Kansas, Maine, North Dakota, Rhode Island, and South Dakota" because it believed "that a named plaintiff lacks standing to assert claims on behalf of putative class members whose claims arise under other states' laws" and the named plaintiffs did not include anyone from those states. D.E. 2515 at 36–38.

After the district court's motion to dismiss order, the Economic Loss and Medical Monitoring Plaintiffs filed separate amended complaints[4] and the generic-

---

[4] D.E. 2832-1 (Consol. Med. Monitoring Class Action Compl.); D.E. 2835 (Consol. Am. Consumer Econ. Loss Class Action Compl.).

only manufacturers again moved to dismiss based on federal preemption. The district court granted the motion and dismissed all claims against the defendants who manufactured only generic Ranitidine Products. D.E. 3750.

### F. The District Court Holds that the Economic Loss Plaintiffs Have Standing

During motion to dismiss briefing, the defendants moved to dismiss the Economic Loss Plaintiffs for lack of standing, arguing that they had not alleged injury in fact as "absent allegations of physical injury or inefficacy, Plaintiffs cannot assert that a lawfully purchased product was 'worthless' due to the alleged presence of an impurity." D.E. 3116 at 40. The Economic Loss Plaintiffs responded that they suffered an economic loss because Ranitidine Products were "worth less" than what they paid because Plaintiffs purchased them without knowing that they contained NDMA, and they would not have done so had they known the truth. D.E. 3429 at 36–37.

The district court agreed with the Economic Loss Plaintiffs and held that they had standing because they "allege[d] that they have suffered tangible harm through financial loss" by "purchasing worthless drugs that contained NDMA and were misbranded, and which the Plaintiffs would not have purchased but for the Defendants' conduct." D.E. 3720 at 50–51.

**G.    The District Court Improperly Excludes Plaintiffs' Experts' Opinions on General Causation and Grants Summary Judgment Against the Personal Injury Plaintiffs**

After resolving multiple rounds of motions to dismiss, the district court set a schedule whereby the parties would first conduct expert discovery on general causation—whether Ranitidine Products can cause cancer, D.E. 6120 at 24—followed by *Daubert* motions addressing those experts' opinions.  D.E. 4660 at 2–3.  After the district court issued its *Daubert* rulings on the general causation experts, the Medical Monitoring and Economic Loss Plaintiffs would then move for class certification and submit expert reports, followed by *Daubert* briefing on the class certification experts.  *Id.* at 3.  The district court did not set any schedule on summary judgment motions for the Medical Monitoring and Economic Loss Plaintiffs' claims.  *Id.* at 1.

Following the district court's schedule, the Personal Injury Plaintiffs and the Ranitidine Manufacturers completed *Daubert* briefing regarding the general causation experts' opinions on whether Ranitidine Products cause certain cancers (bladder, esophageal, gastric, liver, and pancreatic cancer).  D.E. 6120 at 15.  At the same time, the Ranitidine Manufacturers also moved for summary judgment on the issue of whether Ranitidine Products cause cancer against the Personal Injury Plaintiffs (not the Medical Monitoring or Economic Loss Plaintiffs).  *Id.* at 18–19.

Addressing the *Daubert* and summary judgment motions together, the district court issued the "General Causation Order." D.E. 6120. The court granted the Ranitidine Manufacturers' *Daubert* motions and excluded the plaintiffs' experts' opinions on general causation and, as a result, granted summary judgment against the Personal Injury Plaintiffs because they could not prove Ranitidine Products cause cancer. General Causation Order at 336–37.

## H. The District Court Issues Show Cause Orders as to the Medical Monitoring and Economic Loss Plaintiffs' Claims

After the General Causation Order, all parties agreed that briefing on class certification for the Medical Monitoring and Economic Loss Plaintiffs should not proceed. D.E. 6148 at 1. Plaintiffs moved to stay proceedings on the Medical Monitoring and Economic Loss Plaintiffs' claims pending appeal of the General Causation Order or, alternatively, to revise the deadlines for class certification expert reports and motions. *Id.*

The district court responded by issuing a show cause order and staying "[a]ll class proceedings." D.E. 6484 at 2. The court ordered "Plaintiffs to show cause why their economic loss class action claims should not be dismissed for lack of standing and as pre-empted by federal law." *Id.* at 2. The court did not direct the Economic Loss Plaintiffs to submit evidence to prove their injuries; instead, it asked them to "explain how they suffered an injury in fact" and how "their position on standing and their position on pre-emption are internally consistent." *Id.* at 27.

Separately, the court ordered under Federal Rule of Civil Procedure 56(f) for "Plaintiffs to show cause why the Court should not enter summary judgment in the Defendants' favor . . . for the same reasons that the Court entered summary judgment in the Defendants' favor for the Plaintiffs' personal injury claims," *i.e.*, for lacking evidence that Ranitidine Products cause five specific cancers. *Id.* at 2 (footnote omitted); *see also id.* at 27 (ordering plaintiffs to "show cause as to why they may pursue their economic loss class action claims without evidence that ranitidine causes cancer").

In response, the Economic Loss Plaintiffs explained, among other things, that they had standing and that their claims were still viable even if the Personal Injury experts could not opine that Ranitidine Products cause the five types of cancer addressed in the General Causation Order. D.E. 6589. Plaintiffs observed that the court had previously held, during the motion to dismiss briefing, that the Economic Loss Plaintiffs had standing because they alleged that they were deceived into paying money for worthless Ranitidine Products and that they still had standing for the same reason. *Id.* at 13. The Economic Loss Plaintiffs also observed that it was premature to revisit standing, as the case was not yet at the summary judgment stage and no expert reports had been submitted on the economic value of Ranitidine Products. *Id.* at 13–14 & n.5. Finally, the Economic Loss Plaintiffs pointed out that any decision based on the General Causation Order and whether it could be proven that Ranitidine

Products caused certain cancers would be a decision on the merits (not standing) and that it was erroneous to assume that the Ranitidine Products' economic value was equal to their propensity to cause the particular cancers addressed in the General Causation Order. *Id.* at 15.

The Ranitidine Manufacturers' response to the show cause order agreed that any decision from the district court based on the General Causation Order would be addressing "the merits, not . . . standing." D.E. 6624 at 26.

The district court then issued a second show cause order that directed the Economic Loss Plaintiffs to answer specific questions regarding standing and preemption and gave Plaintiffs only seven days to respond. D.E. 6639; D.E. 6640. Again, the court did not invite the Economic Loss Plaintiffs to submit evidence to support their injuries. To the contrary, the court only asked Plaintiffs to "explain to the Court their theory of injury in fact" and "inform the Court where in their pleadings they have pled [an adulteration] theory and in what filings they have pursued such a theory" and potentially "provide caselaw" supporting standing. D.E. 6639 at 4–5.

On the issue of standing, Plaintiffs responded and explained how they had standing because their "harm was purchasing a product that was not as represented" and cited to supporting allegations in the Second Amended Economic Loss Class Action Complaint. D.E. 6676 at 7–10.

## I. The District Court Dismisses the Economic Loss Plaintiffs for Lack of Standing and Enters Summary Judgment Against the Medical Monitoring Plaintiffs

Following the two show cause orders, the district court entered a final order dismissing the Economic Loss Plaintiffs for not having an injury in fact and therefore no standing and granting summary judgment against the Medical Monitoring Plaintiffs. For the Economic Loss Plaintiffs, the court discussed extensively the purported impact of the General Causation Order on the merits of their claims. The court observed that "[w]ithout proof of cancer causation, the Plaintiffs cannot succeed in proving their claims as pled" under what the court referred to as Plaintiffs' "misbranding theory." D.E. 6795 at 11. The district court similarly held that the Economic Loss Plaintiffs' "adulteration theory" was "not viable." *Id.* at 21–25.

The court also found that the Economic Loss Plaintiffs had somehow narrowed their claims such that they had "abandoned the contention that ranitidine is worth less (some value greater than zero)" and "lack[ed] any basis . . . to advance the proposition that ranitidine is worthless, with a value of zero." *Id.* at 18. The court also stated that Plaintiffs were required "to put forward evidence to prove injury-in-fact" but had not done so—even though the Economic Loss Plaintiffs' claims had not yet gone through expert discovery for class certification. *Id.* at 25–26.

Ultimately, the court held that the Economic Loss Plaintiffs could not prove that Ranitidine Products cause cancer so they "have no viable economic injury-in-fact because, without evidence of harm, the Plaintiffs can only prove that they regret purchasing a product that performed as advertised" and therefore "do not have standing." *Id.* at 29. The court therefore dismissed the Economic Loss Plaintiffs. *Id.* at 30.

Addressing the Medical Monitoring Plaintiffs, the court relied on the General Causation Order and held that the Medical Monitoring Plaintiffs "do not have proof that they have an increased risk of cancer and, thus, have no basis to request periodic testing for cancer through medical monitoring class action claims." D.E. 6795 at 9–10.

The Economic Loss and Medical Monitoring Plaintiffs then filed this appeal.

## STANDARD OF REVIEW

The Court "review[s] de novo a district court's dismissal for lack of subject-matter jurisdiction." *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1045 (11th Cir. 2020). The Court reviews de novo the district court's grant of summary judgement and the exclusion of expert testimony for abuse of discretion. *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1244–45 (11th Cir. 2018). An order on a motion to dismiss is also reviewed de novo. *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010).

# SUMMARY OF ARGUMENT

The district court's dismissal of the Economic Loss Plaintiffs for not having standing should be reversed. The Economic Loss Plaintiffs have an injury in fact because they paid money for recalled Ranitidine Products that they would not have purchased but for the Ranitidine Manufacturers' deceptive concealment and misrepresentations about the presence of NDMA in the Products. By spending money on products that the Economic Loss Plaintiffs would not have otherwise purchased—and which were worth less than what they paid due to the undisclosed NDMA—they suffered a concrete, monetary injury.

In reaching the opposite conclusion, the district court erred as a matter of law in multiple ways, each of which independently supports reversal. First, the district court improperly looked to the merits of the Economic Plaintiffs' claims to determine standing and failed to assume, as required, that Plaintiffs' claims would succeed. Second, the court applied the burden of proof applicable at summary judgment when the Economic Loss Plaintiffs' claims had not even reached the class certification stage and no summary judgment schedule was set—thereby depriving Plaintiffs of the ability to marshal evidence of their injuries through expert testimony. And, third, the district court improperly concluded from the General Causation Order and purported lack of evidence that Ranitidine Products cause cancer that the Economic Loss Plaintiffs had not suffered any injury. Whether

Ranitidine Products cause cancer is not determinative of their economic value and whether they were worth what the Economic Loss Plaintiffs paid for them, and Plaintiffs need not prove that the Products cause cancer to prevail on their claims.

The district court also erred by dismissing for lack of standing the Economic Loss and Medical Monitoring Plaintiffs' claims arising under states' laws where no named plaintiff resided or had purchased Ranitidine Products. As this Court has already held in a different appeal, whether named plaintiffs in a class action can bring such claims is an issue to be decided under Federal Rule of Civil Procedure 23 and is irrelevant to standing.

The district court's grant of summary judgment against the Medical Monitoring Plaintiffs should be reversed because, as explained in the Personal Injury Plaintiffs' opening brief, the district court misapplied *Daubert* and this Court's precedent to exclude Plaintiffs' experts' opinions on general causation, resulting in the court improperly weighing the evidence itself instead of simply determining whether the experts employed reliable methodologies and data.

Finally, the district court's dismissal of all Plaintiffs' claims against the generic-only manufacturers of Ranitidine Products as preempted by federal law should be reversed because it misapplies the law of preemption for the reasons explained in Parts II and III of the Generic-Only Plaintiffs-Appellants' opening brief.

# ARGUMENT

## I. The District Court Erred By Dismissing The Economic Loss Plaintiffs For Lack Of Standing

The district court's dismissal of the Economic Loss Plaintiffs for lack of standing—specifically, lack of injury in fact—should be reversed. The Economic Loss Plaintiffs suffered a financial injury because they were deceived by the Ranitidine Manufacturers' wrongful conduct into buying Ranitidine Products that Plaintiffs would not have purchased had they known the truth about the Products, and the Products were worth less than what the Economic Loss Plaintiffs paid. Plaintiffs' monetary losses from those purchases and overpayment for Ranitidine Products is a straightforward and well-established injury in fact.

"The three requirements for Article III standing are familiar: the plaintiff must allege that he suffered an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent'; that injury must be 'fairly traceable to the challenged action of the defendant'; and it must be 'likely . . . that the injury will be redressed by a favorable decision.'" *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1268 (11th Cir. 2019) (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "In plainer language, the plaintiff needs to show that the defendant harmed him, and that a court decision can either eliminate the harm or compensate for it." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc).

To determine whether a plaintiff has standing, the Court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Clements v. LSI Title Agency, Inc.*, 779 F.3d 1269, 1273 (11th Cir. 2015) (alterations in original) (quoting *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003)). "'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice' to establish standing." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1323 (11th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561).

Here, the only element at issue is injury in fact. "To establish an injury in fact a plaintiff must have suffered 'an invasion of a legally protected interest' that is both 'concrete and particularized.'" *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 923 (11th Cir. 2023) (quoting *Lujan*, 504 U.S. at 560). "An injury is particularized if it 'affect[s] the plaintiff in a personal and individual way.'" *Id.* (alteration in original) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). And "[a]n injury is concrete if it is 'real' and 'not abstract.'" *Id.* (quoting *Spokeo*, 578 U.S. at 340).

When the district court first addressed the Economic Loss Plaintiffs' injury in fact during motion to dismiss briefing, the court correctly concluded that Plaintiffs had established an injury and standing because they "allege[d] that they have suffered tangible harm through financial loss" by "purchasing worthless drugs that contained NDMA and were misbranded, and which the Plaintiffs would not have

purchased but for the Defendants' conduct." D.E. 3720 at 50–51. The district court later reversed course, reasoning that, "[a]fter the Court's [General Causation Order] ruling, . . . the Plaintiffs can no longer claim that ranitidine is unsafe or should not have been sold because of its cancer-causing propensity." D.E. 6795 at 28. Thus, relying on the General Causation Order, the court concluded that "Plaintiffs have no viable economic injury-in-fact because, *without evidence of harm*, . . . the Plaintiffs do not have standing to pursue their economic loss class action claims." *Id.* at 29 (emphasis added).

The district court's dismissal is based on multiple errors of law, each of which is independently sufficient for reversal. First, the court erred by conflating the merits (whether the Economic Loss Plaintiffs can *prove* the Ranitidine Products they purchased were worth less than what they paid and whether they have viable causes of action) with standing. Second, the court improperly applied the burden of proof applicable at summary judgment even though the Economic Loss Plaintiffs' claims had not even reached the class certification stage, let alone summary judgment. Third, even assuming the district court did not apply the wrong standing framework, the district court misinterpreted the General Causation Order as establishing that the Ranitidine Products the Economic Loss Plaintiffs purchased were worth precisely what the Economic Loss Plaintiffs paid, even though the Order addressed only the

admissibility of some witnesses' expert testimony about the propensity of Ranitidine Products to cause certain cancers.

### A. The Economic Loss Plaintiffs Have Standing Because They Suffered Monetary Harm

The Economic Loss Plaintiffs were deceived into buying and overpaying for Ranitidine Products due to the Ranitidine Manufacturers' deceptive, wrongful concealment of the presence of unacceptable levels of NDMA. Such a monetary or economic injury is a classic injury in fact. "The Supreme Court has said that '[i]f a defendant has caused physical or *monetary* injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.'" *Garcia-Bengochea*, 57 F.4th at 924 (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021)). Accordingly, this Court has repeatedly recognized "that 'financial loss' is an 'obvious' tangible harm that constitutes an injury in fact." *Id.* (quoting *Muransky*, 979 F.3d at 926); *see, e.g.*, *Resnick*, 693 F.3d at 1323 ("Plaintiffs allege that they have become victims of identity theft and have suffered monetary damages as a result. This constitutes an injury in fact under the law." (footnote omitted)); *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1243 (11th Cir. 2022) (en banc) ("The most obvious concrete harm is a physical injury or financial loss."); *MPSA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) ("[E]conomic injury[] . . . is the epitome of 'concrete.'"). For example, a plaintiff who alleged that he was deceived into paying automatic gratuities and taxes on those

gratuities at restaurants "suffered" an economic injury that constituted "an individual injury-in-fact." *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1047 (11th Cir. 2020).

Here, the Economic Loss Plaintiffs suffered an injury in fact by being deceived into buying Ranitidine Products that they would otherwise not have purchased but for Defendants' deception. In addition, those Products were worthless, or at least worth less than what the Economic Loss Plaintiffs paid, due to the undisclosed presence of NDMA as no reasonable consumer would be willing to pay the same for a product that contained a toxic chemical versus a product that does not. The Economic Loss Plaintiffs allege that the Ranitidine Manufacturers "uniformly deceived millions of U.S. consumers into purchasing a defective, misbranded, adulterated, and harmful drug" by "market[ing] and tout[ing] [Ranitidine Products] as safe and effective" and "conceal[ing] the inherent dangers and risks associated with ranitidine." Second Amended Economic Loss Compl. at 13. Among other things, the Ranitidine Manufacturers "did not disclose that [Ranitidine Products] . . . break[] down into carcinogenic NDMA at levels that exceed the maximum daily limit" set by the FDA. *Id.* at 13–14; *see also id.* ¶¶233–84 (explaining how ranitidine degrades into NDMA); *id.* ¶¶292–303 (Ranitidine Manufacturers' knowledge of degradation); *id.* ¶¶311, 328–29, 331 (Ranitidine Manufacturers' failure to disclose NDMA and risks); *id.* ¶¶167–178, 199–209 (health organizations' recognition that NDMA is carcinogenic). NDMA is not only

carcinogenic; it "cause[s] DNA damage in human cells," "can exacerbate existing but dormant . . . tumor cells," and "reduce[s] the ability of the body to combat cancer as NDMA is immunosuppressive." *Id.* ¶¶210–11. Unsurprisingly then, once the truth about Ranitidine Products was publicly disclosed, the Ranitidine Manufacturers and others recalled the Products at the behest of health regulators due to the presence of NDMA. *Id.* ¶¶212–32.

The Economic Loss Plaintiffs therefore allege that Defendants "knowingly and intentionally misrepresent[ed], omitt[ed], conceal[ed], and fail[ed] to disclose material facts" about Ranitidine Products, including that they "contained elevated levels of NDMA." *See, e.g.*, *id.* ¶538. "Had Defendant[s] not engaged in the deceptive acts and practices," Plaintiffs "would not have purchased the drug, and, thus, they did not receive the benefit of the bargain and/or suffered out-of-pocket loss." *See, e.g.*, *id.* ¶545; *see also id.* ¶¶25–63, 65–135 (similar). Due to the Ranitidine Manufacturers' deception, the Economic Loss Class Plaintiffs believed they were purchasing products that did not contain elevated levels of NDMA but instead received Ranitidine Products that contained NDMA—making the Products worth far less than what Plaintiffs paid. *Id.* ¶616 ("Plaintiffs and Class members suffered an impoverishment because they purchased worthless medications and did not receive the expected benefit therefrom."). The Economic Loss Plaintiffs therefore lost money and did not receive the benefit of their bargain, as they never

would have purchased Ranitidine Products had the Ranitidine Manufacturers disclosed that the Products contained NDMA. *See, e.g.*, *id.* ¶¶323, 616. By paying more than they otherwise would have for Ranitidine Products (*i.e.*, nothing), the Economic Loss Plaintiffs suffered monetary losses that satisfy the injury in fact requirement. *See Fox*, 977 F.3d at 1047.

This Court has already held that effectively the same injuries arising from the purchase of Ranitidine Products satisfy the injury in fact requirement. In a related appeal from this same multidistrict litigation, the plaintiff organization alleged "that [it] provide[d] eligible members with health and welfare benefits, including the payment of and reimbursement for prescription drugs" and had reimbursed members for purchasing worthless Ranitidine Products. *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 21-10335, 2022 WL 16729170, at *1 (11th Cir. Nov. 7, 2022) (per curiam). The Court held that the plaintiff's "economic injury satisfies Article III's injury-in-fact requirement." *Id.* at *3. If reimbursing someone for purchasing worthless Ranitidine Products constitutes an injury in fact, then being deceived into directly spending money to purchase such Products necessarily must be an injury in fact. Even the district court held the same earlier in this litigation. D.E. 3720 at 51 ("[T]he Plaintiffs have plausibly alleged economic injury-in-fact through purchasing worthless drugs that contained NDMA and were misbranded, and which the Plaintiffs would not have purchased but for the Defendants' conduct.").

Indeed, this Court and numerous others have held that a plaintiff who either would not have purchased a product or would have paid less but for a defendant's deceptive conduct has an injury in fact. In *Debernardis v. IQ Formulations, LLC*, the plaintiffs alleged they purchased supplements that could not lawfully be sold and were therefore worthless. 942 F.3d 1076, 1084 (11th Cir. 2019). The district court dismissed the plaintiffs for lack of standing because they did not allege that the supplements "failed to perform as advertised, . . . caused any adverse health effects, or that the plaintiffs paid a premium" for them. *Id.* at 1083. This Court reversed. The Court held that "[a] person experiences an economic injury when, as a result of a deceptive act or an unfair practice, he is deprived of the benefit of his bargain" even when there is "no indication that she was physically harmed by the product, the product failed to work as intended, or she paid a premium for the product." *Id.* at 1084, 1086. Thus, the plaintiffs had standing because they alleged "that they experienced an economic injury when they paid to purchase an unsafe and therefore worthless product." *Id.* at 1087.

Other circuits are in agreement that "overpayment" for a product based on a defendant's deceptive conduct is sufficient to establish an injury in fact, even if the product "performs adequately and does not cause any physical or emotional injury" to the plaintiff. *In re Evenflo Co. Mktg., Sales Practices & Prods. Liab. Litig.*, 54 F.4th 28, 35 (1st Cir. 2022). For example, the First Circuit held that plaintiffs who

bought car seats for their children relying on "misrepresentations about the safety and testing" of the seats had "adequately pleaded [an] injury" because, but for the misrepresentations, the plaintiffs "would not have purchased the seat, would have paid less for it, and/or would have bought a safer alternative." *Id.* at 32, 36. This was so even though the plaintiffs did "not allege that the plaintiffs' children were hurt while using the seat or that the product otherwise failed to perform." *Id.* at 32. Similarly, the Ninth Circuit held that a plaintiff who purchased a vegetable oil-based spread based on alleged misrepresentations about the product's health benefits "undoubtedly" had standing because "he alleged that he would not have been willing to pay as much as he did for [the spread], if anything, if he had not been misled." *Reid v. Johnson & Johnson*, 780 F.3d 952, 957–58 (9th Cir. 2015). The Second, Fifth, Seventh, and Eighth Circuits have similarly recognized that a plaintiff who purchases a product based on a defendant's misrepresentations has standing, even if the plaintiff is not physically injured and the product otherwise performs as promised. *See In re Evenflo*, 54 F.4th at 35–39 (collecting cases).

So too here. The Economic Loss Plaintiffs allege that they were deceived into paying money for Ranitidine Products they "would not have purchased"—and which deprived Plaintiffs of "the benefit of the bargain" and caused "out-of-pocket loss"— as the result of the Ranitidine Manufacturers' misrepresentations and omissions about the presence of NDMA in the Products. *See, e.g.*, Second Amended Economic

Loss Compl. ¶416. Plaintiffs' financial loss is sufficient to establish standing. *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2022 WL 16729170, at *3; *see Debernardis*, 942 F.3d at 1087; *cf. Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986–87 (11th Cir. 2016) (holding that class members suffered "actual damages" when vehicle they purchased was advertised as having five-star safety ratings when it in fact had none, even though after purchase vehicle was given five-star safety ratings).

Because the Economic Loss Plaintiffs were deceived into purchasing Ranitidine Products (and overpaying for them), Economic Loss Plaintiffs have satisfied the injury in fact requirement.[5]

## B. The District Court Erred by Conflating the Economic Loss Plaintiffs' Standing with the Merits

The district court incorrectly held that the Economic Loss Plaintiffs had not satisfied the injury in fact requirement by conflating standing with the merits of the Economic Loss Plaintiffs' claims. The merits of a plaintiff's claims are irrelevant to standing. "It is firmly established . . . that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens*

---

[5] The other standing elements—redressability and traceability—are not disputed but are satisfied as well. The Economic Loss Plaintiffs' monetary injuries are redressable by the Economic Loss Plaintiffs' requested relief including monetary damages and traceable to the Ranitidine Manufacturers' manufacture, sale, and marketing of Ranitidine Products.

*for a Better Env't*, 523 U.S. 83, 89 (1998); *West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1135 (11th Cir. 2023) ("Standing 'in no way depends on the merits' of the plaintiff's claim." (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))); *Moody v. Holman*, 887 F.3d 1281, 1285 (11th Cir. 2018) ("The Supreme Court has cautioned that federal courts 'must not confuse weakness on the merits with absence of Article III standing.'" (citation omitted)).  This is so because "[a] finding that plaintiff has standing simply means that the plaintiff is entitled to 'walk through the courthouse door' and raise his grievance before a federal court; it is a threshold determination that is conceptually distinct from whether the plaintiff is entitled to prevail on the merits." *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1280 (11th Cir. 2001).

Thus, when analyzing standing, courts "must . . . assume that on the merits" a plaintiff "would be successful." *Garcia-Bengochea*, 57 F.4th at 922 (quotation marks omitted); *see, e.g.*, *Moody*, 887 F.3d at 1285–87, 1292 (holding that district court erred in dismissing for lack of standing even though claim "fail[ed] on the merits").

The district court here confused the Economic Loss Plaintiffs' standing with the merits of their claims.[6]  The court's opinion "review[ed] the *viability* of the

---

[6] As discussed below, the district court was also incorrect that the Economic Loss Plaintiffs could not prevail on the merits but that need not be addressed to resolve this appeal.

Plaintiffs' misbranding theory" through an evidentiary lens and held that, based on the General Causation Order, "the Plaintiffs do not have evidence of cancer causation, . . . [and] cannot succeed in *proving* the[ir] claims." D.E. 6795 at 10 (emphases added); *id.* at 12 ("After the Court's *Daubert* ruling, the Plaintiffs lack reliable evidence to prove that ranitidine is unsafe and, therefore, their misbranding claims cannot succeed."). The district court expressly based its conclusion that the Economic Loss Class Plaintiffs "should be dismissed for lack of standing" on the belief that "Plaintiffs' misbranding theory fails because . . . Plaintiffs lack evidence to *prove* that the NDMA in ranitidine could cause cancer." *Id.* at 12–13 (emphasis added); *id.* at 28 ("In this MDL, the Plaintiffs attempted, but were unable to put forward reliable evidence to prove that ranitidine was unsafe, which now changes the Court's standing analysis.").

By conflating standing with the merits, the district court committed reversible error. *See Moody*, 887 F.3d at 1285–87. Indeed, when this Court addressed standing in a related appeal from the same multidistrict litigation, the Court "assume[d] those claims [were] meritorious when assessing Article III standing." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2022 WL 16729170, at *4. The district court was obligated to do the same here, as even the Ranitidine Manufacturers recognized that applying the General Causation Order to the Economic Loss Plaintiffs as the district

court did would result in a decision on "the merits, not . . . standing."  D.E. 6624 at 26.

The district court's focus on whether the Economic Loss Plaintiffs' claims could prevail on the merits under a "misbranding theory" or an "adulteration theory" was misplaced for the same reason.  D.E. 6795 at 10–13, 15–25.  "When considering standing," courts "do not assess the merits of the underlying cause of action" so "must also accept the validity of the plaintiff's theory of a cause of action."  *Chiles v. Thornburgh*, 865 F.2d 1197, 1202 (11th Cir. 1989).  Whether the Ranitidine Products the Economic Loss Plaintiffs purchased were misbranded or adulterated relates, at best, to the merits of those claims—not standing.  *See Steel*, 523 U.S. at 89.  For standing, the district court was required to assume that the Economic Loss Plaintiffs could succeed in proving that Ranitidine Products were misbranded and adulterated.  *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2022 WL 16729170, at *4 ("Plumbers seeks redress for its injuries under two federal laws and dozens of state laws. We *assume* those claims are meritorious when assessing Article III standing." (emphasis added)).  Instead, the district court erred by applying evidentiary and merits findings related to a distinct and separate group of plaintiffs (the Personal Injury Plaintiffs), who brought different cases.

The district court's discussion of whether the Economic Loss Plaintiffs were arguing that Ranitidine Products were "worthless" or "worth less," D.E. 6795 at 16–

18, was also erroneous, because the quantity of harm is irrelevant to injury in fact and standing so long as there is *any* injury. *Salcedo v. Hanna*, 936 F.3d 1162, 1173 (11th Cir. 2019) ("Article III standing is not a 'You must be this tall to ride' measuring stick. 'There is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be.'" (quoting *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987))).

The Economic Loss Plaintiffs are confident that the facts and the law establish that Ranitidine Products were misbranded and adulterated and that the evidence will show Plaintiffs lost money due to the Ranitidine Manufacturers' deceptive conduct, but whether Plaintiffs can prove their claims goes to the merits—not standing. The district court erred in holding otherwise,[7] and this alone is sufficient to justify reversal.

---

[7] Although not relevant to standing, the district court was also incorrect in finding that Plaintiffs had "concede[d]" the viability of any misbranding theory, did not plead "that ranitidine is 'unsafe' for reasons other than cancer causation," and "abandoned the contention that ranitidine was 'worth less' (two words), instead of 'worthless' (one word)." D.E. 6795 at 12, 16. The Economic Loss Plaintiffs continued to assert their claims based on Ranitidine Products being misbranded even after the General Causation Order. *See, e.g.*, D.E. 6589 at 9 ("Having NDMA in ranitidine renders Defendants' ranitidine both misbranded and adulterated . . . ."). Similarly, the Second Amended Economic Loss Class Action Complaint alleges that Ranitidine Products are adulterated, *see, e.g.*, D.E. 3883 at 3, ¶¶506, 508, and Plaintiffs argued this before the district court, *see, e.g.*, D.E. 2242 at 13, 16, 18–19, 29. The Economic Loss Plaintiffs also made clear that, ultimately, whether

### C. The District Court Erred by Applying a Heightened Burden of Proof

Independent of the improper, merits-based standing analysis applied by the district court, the court also erred by using the burden of proof applicable at summary judgment when the Economic Loss Plaintiffs' claims had not even reached class certification. The district court rejected the Economic Loss Plaintiffs' "adulteration theory" because the Economic Loss Plaintiffs allegedly had not "put forward evidence to prove injury-in-fact." D.E. 6795 at 25–26; *id.* at 28 ("Plaintiffs attempted, but were unable, to put forward reliable evidence to prove that ranitidine was unsafe, which now changes the Court's standing analysis."). In doing so, the district court expressly used the burden of proof applicable to summary judgment by requiring "affidavit[s] or other evidence." *Id.* at 25 (quoting *Lujan*, 504 U.S. at 561).

The Economic Class Plaintiffs' claims, however, had not yet reached the summary judgment stage. Under the district court's scheduling orders, the putative class actions would not move for class certification and serve class certification expert reports until "45 days after" the General Causation Order was issued. D.E. 4660 at 3. The court did not even set a schedule for summary judgment on the Economic Loss Plaintiffs' claims. *Id.* at 1.

---

Ranitidine Products have some value—albeit less than what Plaintiffs paid—or are truly worthless is a question of fact to be resolved through evidence and expert testimony. *See, e.g.*, D.E. 3682 at 189–90.

Further, following the General Causation Order, Plaintiffs and the Ranitidine Manufacturers agreed that class certification should not proceed and Plaintiffs moved to stay all class proceedings pending the outcome of the appeals of the General Causation Order. D.E. 6148. The district court subsequently stayed "[a]ll class proceedings" pending "the Court's ultimate ruling" on the motion to stay. D.E. 6484 at 2. That motion remained pending until the district court denied the motion as moot when the court dismissed the Economic Loss Plaintiffs for lack of standing. D.E. 6795 at 30. Thus, the Economic Loss Plaintiffs' claims never proceeded through expert discovery for class certification or reached the class certification stage, let alone summary judgment.

Because the Economic Loss Plaintiffs' claims had not reached the summary judgment stage, the district court erred in applying a heightened burden of proof and requiring the submission of evidence. The proper burden of proof was the pleading stage burden that requires only "general factual allegations of injury resulting from the defendant's conduct." *Lujan*, 504 U.S. at 561. The Economic Loss Plaintiffs have met that burden, as explained above.

The district court likely applied the wrong burden of proof because the court's show cause orders were issued, in part, pursuant to Federal Rule of Civil Procedure 56(f). D.E. 6484; D.E. 6639. But the process employed by the district court did not

comply with Rule 56(f)'s stringent requirements, so the court could not hold the Economic Loss Plaintiffs to a higher burden of proof.

Rule 56(f) mandates that a court may enter summary judgment on its own motion only "[a]fter [1] giving notice and [2] a reasonable time to respond" and [3] "identifying for the parties material facts that may not be genuinely in dispute." None of those requirements were met with respect to the issue of Economic Loss Plaintiffs' standing.

*First*, the Court did not give the Economic Loss Plaintiffs notice they needed to submit evidence in support of their standing. The only reference to Rule 56(f) in the district court's first show cause order was with respect to explaining "why summary judgment should not be entered in the Defendants' favor for the Plaintiffs' class claims for the same reasons summary judgment was entered in the Defendants' favor for the Plaintiffs' personal injury claims." D.E. 6484 at 27; *see also id.* at 2 (similar). That required the Economic Loss Plaintiffs only to explain why the Court's determination that the Personal Injury Plaintiffs lacked reliable evidence that Ranitidine Products generally cause certain cancers would not support summary judgment against the Economic Loss Plaintiffs on the merits of their claims. *See id.* at 27 ("In other words, if the Plaintiffs believe that the issues of abandonment, pre-emption, and lack of standing raised above do not prevent them from pursuing their economic loss class action claims, they shall show cause as to why they may

pursue their economic loss class action claims without evidence that ranitidine causes cancer as a matter of law . . .").

In the first show cause order, the district court did not direct the Economic Loss Plaintiffs to submit evidence regarding standing. For standing, the district court asked only that the Economic Loss Plaintiffs "explain how they suffered an injury in fact" and "how their position on standing and their position on pre-emption are internally consistent." *Id.*

The district court's second show cause order again did not provide notice that the Economic Loss Plaintiffs needed to submit evidence on standing. D.E. 6639 at 2–5. Instead, the district court asked the Economic Loss Plaintiffs to, among other things, "explain to the Court their theory of injury in fact" and "inform the Court where in their pleadings they have pled [an adulteration] theory and in what filings they have pursued such a theory" and potentially "provide . . . caselaw" supporting standing. *Id.* at 4–5.

Thus, the district court failed to give notice that the Economic Loss Plaintiffs needed to submit evidence in support of their standing. Instead, it directed them to rely on the pleadings—what standing is based on prior to summary judgment, and what the court *should* have relied on here instead of requiring evidence. The district court's failure to give the Economic Loss Plaintiffs notice they needed to submit evidence in support of standing is sufficient to justify reversal. *See Amy v. Carnival*

37

*Corp.*, 961 F.3d 1303, 1310–11 (11th Cir. 2020) (reversing district court's grant of summary judgment where court failed to give "notice that it planned to decide" a particular claim); *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1344 (11th Cir. 2015) (reversing district court's sua sponte grant of summary judgment for failure to give adequate notice).

*Second*, even if the district court had given the Economic Loss Plaintiffs notice they needed to submit evidence of their injuries, the court did not provide a reasonable time to respond. The Court's second show cause order was entered on May 27, 2023, and required the Economic Loss Plaintiffs to respond just over a week later by June 6, 2023. D.E. 6639; D.E. 6640. As explained above, proceedings on the Economic Loss Plaintiffs' claims had been stayed, so no deadlines for the Economic Loss Plaintiffs' expert reports on class certification had been set, let alone a summary judgment schedule.

By giving the Economic Loss Plaintiffs only seven days to respond to the second show cause order, the Economic Loss Plaintiffs were wholly deprived of their right to conduct expert discovery and obtain expert testimony regarding the economic value of Ranitidine Products and the extent of their financial losses. Seven days likely is not even enough time to collect affidavits from the scores of named plaintiffs. This too justifies reversal. *See Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 104 (1st Cir. 2017) (reversing Rule 56(f) grant of summary

judgment where there was not "a reasonable opportunity to conduct discovery on a particular issue"); *Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201 (11th Cir. 2003) (observing that the Eleventh Circuit has reversed a district court's grant of summary judgment where "summary judgment . . . involved a question of fact which the non-moving party had not been afforded an adequate opportunity to develop" (citing *Massey v. Congress Life Ins. Co.*, 116 F.3d 1414, 1418 (11th Cir. 1997))); *cf. Rensel v. Centra Tech., Inc.*, 2 F.4th 1359, 1367 (11th Cir. 2021) (district court abused discretion in holding class certification motion untimely because "class action plaintiffs often require discovery to inform their class certification arguments" and district court's rulings deprived plaintiffs of ability to obtain discovery).

*Third*, the district court's show cause orders did not "identify[] . . . material facts that may not be genuinely in dispute" regarding standing. Had the district court done so, the Economic Loss Plaintiffs would have been alerted to the court's intentions and the need to submit evidence of their injuries. Because the district court did not, the Economic Loss Plaintiffs could not know that they needed to put forward evidence in order to avoid dismissal for lack of standing.

Taken independently or altogether, the district court's violation of Rule 56(f) barred the court from relying on Rule 56(f) to impose a heightened burden of proof on the Economic Loss Plaintiffs with respect to standing. Because the district court

nevertheless based its dismissal on a purported lack of evidence, the court applied the wrong burden of proof and should be reversed.

**D.    Even if the District Court Applied the Proper Standing Framework, the Court Erred in Concluding that the General Causation Order Established that the Economic Loss Plaintiffs Were not Injured**

Even if the district court applied the proper standing analysis, the district court should still be reversed because the court relied on the General Causation Order to conclude the Economic Loss Plaintiffs had not suffered any injury and therefore lacked standing.  As a threshold matter, if the Court reverses the General Causation Order as the Medical Monitoring Plaintiffs and Personal Injury Plaintiffs urge, then the dismissal of the Economic Loss Plaintiffs should be reversed as well because the district court's dismissal relies entirely on General Causation Order.  *See, e.g.*, D.E. 6795 at 12–13 (concluding Plaintiffs "should be dismissed for lack of standing" because they "lack evidence to prove the NDMA in ranitidine could cause cancer").  If the General Causation Order is not reversed, the Order nevertheless provides no basis for the district court's dismissal because the Order does not address the economic value of Ranitidine Products.

The General Causation Order did not decide what Ranitidine Products are worth.  Instead, the Order addressed only whether the Personal Injury Plaintiffs' experts' opinions that Ranitidine Products cause certain cancers were admissible

under *Daubert* and whether the Personal Injury Plaintiffs had "admissible primary evidence of general causation." General Causation Order at 15, 336.

General causation is not an element of the Economic Loss Plaintiffs' claims that the Ranitidine Manufacturers misrepresented, concealed, and omitted information about the Ranitidine Products. For example, the Economic Loss Plaintiffs assert a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201, *et seq.* *See, e.g.*, Second Amended Economic Loss Compl. ¶¶4535–53 (Count 311). "A consumer claim under FDUTPA must have three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015). "Causation" under FDUTPA does not refer to whether a product causes a condition or injury, but to whether the defendant's deception would deceive a reasonable person. *Id.* at 1290 ("As the Eleventh Circuit has noted, to prove the causation element of a FDUTPA claim, 'a plaintiff need not prove reliance on the allegedly false statement . . . but rather a plaintiff must simply prove that an objectively reasonable person would have been deceived.'" (ellipsis in original) (quoting *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011))). Thus, the Economic Loss Plaintiffs need not prove that the Ranitidine Products they purchased cause cancer in order to prove that the Products were worth less than what they paid. *Cf. In re JUUL Labs, Inc., Mktg.*

*Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 1002–03 (N.D. Cal. 2022) (granting certification of economic loss class over objection that a class action was "not superior" due to individual personal injury claims in the MDL because the "argument wholly ignores the significant distinction between the economic loss claims raised in the operative class action complaint, which can be resolved through aggregate damages or restitution awards based on the price premium model of recovery" and personal injury claims).

The General Causation Order did not address whatsoever the economic value of Ranitidine Products. As the schedule makes clear, the Economic Loss Plaintiffs planned to disclose different experts entirely, who would give opinions on a different question. Although evidence regarding whether Ranitidine Products cause cancer may be relevant to the Products' economic value, such evidence is not *necessary* to show that the Products were worth less than what the Economic Loss Plaintiffs paid. For example, the Economic Loss Plaintiffs can establish that the Ranitidine Products they were deceived into purchasing are worth significantly less than what they paid through evidence such as: "expert testimony regarding the safety, or perceived safety, of Zantac in general (as opposed to expert testimony regarding whether Zantac causes the five designated cancers); . . . expert testimony regarding the economic value of Zantac, including expert testimony regarding how consumers consider dangers that are less rigorously proven than what a court would accept for

purposes of *Daubert*; . . . [and] evidence regarding the FDA's recall of Zantac (likewise applying precautionary standards lower than that which passes muster under *Daubert*) . . . ." D.E. 6589 at 14 (footnote omitted). Indeed, even the district court "intuitively underst[oo]d how a reasonable juror could conclude, using an objective standard, that a performing product has a reduced value because it contains impurities" like NDMA. D.E. 6795 at 29 n.14.

The Economic Loss Plaintiffs did not have the opportunity to develop evidence on the economic value of Ranitidine Products because the parties did not have the opportunity to conduct expert discovery for class certification, and the district court never *asked* for evidence on the merits of the Economic Loss Plaintiffs' claims. At most, the district court set a schedule for expert discovery on class certification, D.E. 4660 at 3, yet the district court stayed those deadlines after the district court issued the General Causation Order, D.E. 6484 at 2.

Thus, even if it was correct for the district court to address whether the Economic Loss Plaintiffs could prove on the merits that Ranitidine Products cause cancer in order to determine Plaintiffs' standing, the district court still erred because that issue (and the General Causation Order) does not prove that the Economic Loss Plaintiffs received the full benefit of their bargain, and therefore suffered no harm, when they purchased Ranitidine Products. After all, ranitidine is *still* off the market, and no reasonable consumer would consume it, much less purchase it at full price.

## II.     The District Court Erred In Dismissing For Lack of Standing Claims Brought Under Other States' Laws

Early in the litigation, the district court also dismissed the Economic Loss and Medical Monitoring Plaintiffs' claims "brought under the laws of Delaware, Hawaii, Kansas, Maine, North Dakota, Rhode Island, and South Dakota" because it believed "that a named plaintiff lacks standing to assert claims on behalf of putative class members whose claims arise under other states' laws" and the named plaintiffs did not include anyone from those states.  D.E. 2515 at 36–38.  In a related case arising from that same order, this Court held that the district court's reasoning was erroneous because this was an issue for Rule 23 and not an Article III standing problem.  *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 21-10335, 2022 WL 16729170, at *6 (Nov. 7, 2022) (per curiam).  That precedent applies equally here, and so this Court should vacate the order at D.E. 2515 with respect to these appeals as well.

## III.    The District Court Erred In Granting Summary Judgment Against The Medical Monitoring Plaintiffs Based On The General Causation Order

Relying entirely on the General Causation Order, the district court granted summary judgment against the Medical Monitoring Plaintiffs reasoning that they could not prove they had an increased risk of *any* cancer from the Ranitidine Products they consumed because the Personal Injury Plaintiffs' experts were

excluded.[8]  D.E. 6795 at 9–10 ("The significance of the Court's *Daubert* ruling is that the Plaintiffs do not have proof that they have an increased risk of cancer and, thus, have no basis to request periodic testing for cancer through medical monitoring class action claims."); *id.* at 29–30 (granting summary judgment).  The district court erred in granting summary judgment because the General Causation Order is flawed and should be reversed for the reasons stated in Part II of the Personal Injury Plaintiffs' opening brief, which the Medical Monitoring Plaintiffs hereby incorporate by reference.

## IV.   The District Court Erred In Dismissing Claims Against Generic-Only Manufacturers As Preempted By Federal Law

The district court misapplied preemption doctrine by dismissing the Economic Loss and Medical Monitoring Plaintiffs claims against the generic defendants.  The court's orders granting motions to dismiss those claims should therefore be reversed as explained in Parts II and III of the Generic-Only Plaintiffs' opening brief, which the Economic Loss and Medical Monitoring Plaintiffs hereby incorporate by reference.

---

[8] The Medical Monitoring Plaintiffs accept for purposes of this appeal that the General Causation Order applies to their claims, even though it only addresses expert testimony regarding whether Ranitidine Products increase the risk of five specific cancers (as opposed to *any* cancer).  Plaintiffs were entitled to present different experts had they wished to do so.

## CONCLUSION

For the foregoing reasons, the district court's order should be reversed, and these cases should be remanded for further proceedings.

Dated:  April 10, 2024    Respectfully submitted,

Robert C. Gilbert       */s/ Ashley Keller*
KOPELOWITZ OSTROW FERGUSON  Ashley Keller
WEISELBERG GILBERT     KELLER POSTMAN LLC
2800 Ponce de Leon Blvd, Suite 1100 150 N. Riverside Plaza, Suite 4100
Coral Gables, FL 33134    Chicago, IL 60606
Tel: (305) 384-7270     Tel: (312) 741-5222
gilbert@kolawyers.com    ack@kellerpostman.com

           Zachary Clark
           Noah Heinz
           KELLER POSTMAN LLC
           1101 Connecticut Avenue NW
           Suite 1100
           Washington, DC 20036
           zachary.clark@kellerpostman.com
           noah.heinz@kellerpostman.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,638 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: April 10, 2024

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

On April 10, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiffs-Appellants*