# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

IDA ADAMS, *et al.*,

> *Plaintiffs-Appellants-*
> *Cross-Appellees,*

v.

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., *et al.*,

> *Defendants-Appellees-*
> *Cross-Appellants.*

On Appeal from the United States District Court for the
Southern District of Florida, MDL No. 2924

## BRAND DEFENDANTS' RESPONSE BRIEF
## AND CROSS-APPEAL OPENING BRIEF
## IN ECONOMIC LOSS AND MEDICAL MONITORING
## PUTATIVE CLASS ACTIONS

Ilana H. Eisenstein
Rachel A.H. Horton
M. David Josefovits
DLA PIPER LLP (US)
1650 Market St., Ste. 5000
Philadelphia, PA 19103
(215) 656-3300
ilana.eisenstein@dlapiper.com
rachel.horton@dlapiper.com
david.josefovits@dlapiper.com

Samantha L. Chaifetz
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
(202) 799-4082
samantha.chaifetz@dlapiper.com

*Counsel for Sanofi-Aventis U.S.*
*LLC, Sanofi US Services, Inc.,*
*and Chattem, Inc.*

*Additional Counsel on Inside Cover*

Daniel S. Pariser
Sally L. Pei
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000

*Counsel for Sanofi-Aventis U.S.
LLC, Sanofi US Services, Inc.,
and Chattem, Inc.*

Paul Alessio Mezzina
Joshua N. Mitchell
Mathew Noller
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Suite 900
Washington, D.C. 20006
(202) 626-8972

Madison Kitchens
KING & SPALDING, LLP
1180 Peachtree St., N.E.
Suite 1600
Atlanta, GA 30309
(404) 572-2712

*Counsel for Boehringer
Ingelheim Pharmaceuticals,
Inc., Boehringer Ingelheim
Corporation, and Boehringer
Ingelheim USA Corporation*

Jay P. Lefkowitz
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Cole Carter
KIRKLAND & ELLIS, LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-1951

*Counsel for GlaxoSmithKline
LLC, GlaxoSmithKline
Holdings (Americas) Inc.,
and GlaxoSmithKline PLC*

Joseph G. Petrosinelli
Amy Mason Saharia
Anne E. Showalter
Libby Baird
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, D.C. 20024
(202) 434-5000

*Counsel for Pfizer Inc.*

Steven Reitenour
BOWMAN AND BROOKE LLP
150 S. 5th St., Ste. 3000
Minneapolis, MN 55402
(612) 672-3244

*Counsel for Patheon
Manufacturing Services LLC*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellees Sanofi-Aventis U.S. LLC, Sanofi US Services, Inc., Chattem, Inc., GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., GlaxoSmithKline PLC, Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, Boehringer Ingelheim USA Corporation, Pfizer Inc., and Patheon Manufacturing Services LLC hereby certify that the previously filed Certificate of Interested Persons and Corporate Disclosure Statements remain correct, with the addition of:

- Boehringer Ingelheim Auslandsbeteiligungs GmbH – Parent company of Defendant Boehringer Ingelheim USA Corporation

- Libby Baird, Counsel for Defendant-Appellee Pfizer Inc.

- Joshua N. Mitchell, Counsel for Defendant-Appellee Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, and Boehringer Ingelheim USA Corporation

- Mathew Noller, Counsel for Defendant-Appellee Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation,

and Boehringer Ingelheim USA Corporation

- Daniel S. Pariser, Counsel for Defendants-Appellees Sanofi-Aventis U.S. LLC, Sanofi US Services, Inc., and Chattem, Inc.

- M. David Josefovits, Counsel for Defendants-Appellees Sanofi-Aventis U.S. LLC, Sanofi US Services, Inc., and Chattem, Inc.

- Steven Reitenour as Counsel for Patheon Manufacturing Services LLC

Dated: July 25, 2024

*/s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
*Counsel for Sanofi-Aventis U.S. LLC, Sanofi US Services, Inc., and Chattem, Inc.*

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz
*Counsel for GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., and GlaxoSmithKline PLC*

*/s/ Paul Alessio Mezzina*
Paul Alessio Mezzina
*Counsel for Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, and Boehringer Ingelheim USA Corporation*

_/s/ Amy Mason Saharia_

Amy Mason Saharia
_Counsel for Pfizer Inc._

_/s/ Steven Reitenour_

Steven Reitenour
_Counsel for Patheon_
_Manufacturing Services LLC_

## STATEMENT REGARDING ORAL ARGUMENT

Brand Defendants[1] believe oral argument would assist the Court in its disposition of the issues presented by this appeal and conditional cross-appeal—one of several related appeals arising out of the *In re Zantac (Ranitidine)* multidistrict litigation ("MDL"). *See Chandler*, 21-12618; *Abdoo*, 21-14325; *Sanders*, 23-10640; *Townsend*, 23-11080; *Base*, 23-12584; *Adams*, 23-12742; *Neely*, 23-13155; *Stoltz*, 23-13182; and *Krause*, 23-13283.

---

[1] Brand Defendants are Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, Boehringer Ingelheim USA Corporation (collectively, "Boehringer Ingelheim"); GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., and GlaxoSmithKline PLC (collectively, "GSK"); Patheon Manufacturing Services, LLC ("Patheon"); Pfizer Inc. ("Pfizer"); and Chattem, Inc., Sanofi US Services Inc., and Sanofi-Aventis U.S. LLC (collectively, "Sanofi").

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT .............................................................i

STATEMENT REGARDING ORAL ARGUMENT .................................iv

TABLE OF CONTENTS .......................................................................v

TABLE OF AUTHORITIES .................................................................viii

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES ...........................................................4

STATEMENT OF THE CASE ...............................................................6

   I.   Factual Background......................................................................6

      A. The FDA Repeatedly Evaluated and Approved Zantac as
         Safe and Effective. .......................................................6

      B. Plaintiffs Swiftly Filed Suit After an Online Pharmacy,
         Using Extreme Testing Conditions, Reported Finding
         NDMA in Zantac Samples. ...........................................7

   II.   Legal Background ......................................................................10

      A. Federal Misbranding and Adulteration Statutes. .....................10

      B. Express and Implied Preemption Under the FDCA. .................11

   III.  Procedural History.....................................................................14

      A. The District Court Organized This MDL Through Case-
         Management Orders and Addressed Three Rounds of
         Complaints. ..............................................................14

      B. The Parties Completed Years of Fact and Expert Discovery. ...23

C. The District Court Held Plaintiffs Lacked Reliable Evidence That Zantac Causes Cancer. ....................................................25

D. After the District Court Found No Reliable Evidence That Zantac Causes Cancer, the Putative Class Actions Unraveled...........................................................................26

STANDARD OF REVIEW...................................................................33

SUMMARY OF THE ARGUMENT .....................................................34

ARGUMENT ......................................................................................38

I. The District Court Properly Dismissed Plaintiffs' Economic-Loss Claims Because Plaintiffs Lacked Standing and Could Not Show Zantac Can Cause Cancer and Was Therefore "Worthless." ......38

A. Plaintiffs Could Not Prove Their Sole Theory of Economic-Loss Injury—That Zantac Was "Misbranded" and "Worthless" Because It Caused Cancer.....................................40

B. Alternatively, This Court May Affirm Because the Economic-Loss Complaint Could Have Been Properly Rejected on the Merits. ...............................................................49

C. The District Court Provided Plaintiffs Ample Notice and Opportunity to Show Cause Why Dismissal Was Not Appropriate. ...............................................................................50

II. Plaintiffs Waived, Forfeited, and Failed to Plead Other Theories of Economic Injury. ...................................................................54

A. Plaintiffs Do Not Challenge the District Court's Correct Conclusion That They Failed to Plead Price-Premium Claims and Expressly Disavowed Them. ..................................55

B. After Failing to Plead Price-Premium Claims Based on Adulteration, Plaintiffs Did Not Meet the Standard for Late-Stage Amendment. ................................................................60

C. Even If Plaintiffs' Adulteration Claims Had Been Pleaded and Preserved, They Are Not Viable...........................................62

III. Plaintiffs Conceded Their Medical-Monitoring Claims Were Not Viable Because There Was No Evidence That Zantac Can Cause Cancer. ........................................................................................66

CONCLUSION ...........................................................................68

CONDITIONAL CROSS-APPEAL ...........................................69

STATEMENT OF JURISDICTION.............................................69

CONDITIONAL CROSS-APPEAL ...........................................69

SUMMARY OF ARGUMENT ....................................................69

CROSS-APPEAL ARGUMENT .................................................72

I. Express Preemption Barred Plaintiffs' Economic-Loss Claims..73

II. Even If "Misbranding" Claims Survived Express Preemption, They Were Impliedly Preempted...............................................78

CROSS-APPEAL CONCLUSION ..............................................84

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

vii

# TABLE OF AUTHORITIES

**Cases**        **Page(s)**

*In re Acetaminophen-ASD-ADHD Prods. Liab. Litig.,*
No. 22-3043, 2023 WL 8711617 (S.D.N.Y. Dec. 18, 2023) ............... 15

*Artistic Ent., Inc. v. Warner Robins,*
331 F.3d 1196 (11th Cir. 2003) ......................................................... 51

*Bischoff v. Osceola Cnty.,*
222 F.3d 874 (11th Cir. 2000) ........................................................... 40

*\*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) ................................................................ *passim*

*Caplinger v. Medtronic, Inc.,*
784 F.3d 1335 (10th Cir. 2015) ......................................................... 72

*Carter v. Novartis Consumer Health, Inc.,*
582 F. Supp. 2d 1271 (C.D. Cal. 2008) ............................ 12, 73, 74, 75

*City of Miami Gardens v. Wells Fargo & Co.,*
931 F.3d 1274 (11th Cir. 2019) ......................................................... 40

*Culverhouse v. Paulson & Co.,*
813 F.3d 991 (11th Cir. 2016) ........................................................... 50

*McCullum ex rel. D.F. v. Orlando Reg'l Healthcare Sys., Inc.,*
768 F.3d 1135 (11th Cir. 2014) ......................................................... 33

*\*In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.,*
756 F.3d 917 (6th Cir. 2014) ....................................................... 78, 79

*\*Debernardis v. IQ Formulations, LLC,*
942 F.3d 1076 (11th Cir. 2019) ................................................. *passim*

*Doss v. General Mills, Inc.,*
816 F. App'x 312 (11th Cir. 2020) ..................................................... 45

i

*Faustino v. Alcon Labs., Inc.*,
No. 15-CV-04145, 2015 WL 12839161 (C.D. Cal. Sept. 22, 2015) ..... 75

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)................................................................................. 10

*Franklin v. Medtronic, Inc.*,
No. 09-CV-02301, 2010 WL 2543579 (D. Colo. May 12, 2010) .......... 81

*In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig.*,
831 F. Supp. 2d 507 (D. Mass. 2011)........................................... 44, 45

*In re Garcia*,
725 F. App'x 911 (11th Cir. 2018)....................................................... 53

*Garrett-Alfred v. Facebook, Inc.*,
540 F. Supp. 3d 1129 (M.D. Fla. 2021)................................................ 66

*Gile v. Optical Radiation Corp.*,
22 F.3d 540 (3d Cir. 1994) .................................................................. 81

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
524 F. Supp. 3d 1007 (S.D. Cal. 2021)........................................... 15, 65

*Islam v. Sec'y, Dep't of Homeland Sec.*,
997 F.3d 1333 (11th Cir. 2021)........................................................... 58

*In re Johnson & Johnson Talcum Powder Prods. Mktg. Sales
Pracs. & Liab. Litig.*, 903 F.3d 278 (3d Cir. 2018)................. 37, 44, 45

*Johnson v. Owens*,
612 F. App'x 707 (5th Cir. 2015).......................................................... 53

*Kanter v. Warner-Lambert Co.*,
99 Cal. App. 4th 780 (Cal. Ct. App. 2002) ................................... 74, 75

*Lavigne v. Herbalife, Ltd.*,
967 F.3d 1110 (11th Cir. 2020)........................................................... 56

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)............................................................................ 39

ii

*Markland v. Insys Therapeutics, Inc.*,
  758 F. App'x 777 (11th Cir. 2018)......................................... 81

*Massey v. Congress Life Ins. Co.*,
  116 F.3d 1414 (11th Cir. 1997)............................................. 81

*Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of
  Educ.*, 342 F.3d 1281 (11th Cir. 2003) ............................... 33

*Mink v. Smith & Nephew. Inc.*,
  860 F.3d 1319 (11th Cir. 2017)................................... *passim*

*Moody v. Holman*,
  887 F.3d 1281 (11th Cir. 2018).................................... 49, 50

*Moore v. Equitrans, L.P.*,
  27 F.4th 211 (4th Cir. 2022) ............................................. 53

*Mutual Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013)................................................. *passim*

*Oahn Nguyen Chung v. StudentCity.com, Inc.*,
  854 F.3d 97 (1st Cir. 2017) ...........................................53-54

*Parker v. Stryker Corp.*,
  584 F. Supp. 2d 1298 (D. Colo. 2008) ............................... 81

*Phillips v. Legacy Cabinets*,
  87 F.4th 1313 (11th Cir. 2023) ......................................... 51

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011)........................................................ 83

*In re Plum Baby Food Litig.*,
  637 F. Supp. 3d 210 (D.N.J. 2022)..................................... 44

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312 (2008).................................................. 12, 74

*Sapuppo v. Allstate Floridian Ins. Co.*,
  739 F.3d 678 (11th Cir. 2014)........................................... 55

iii

*Scantland v. Jeffry Knight, Inc.*,
    721 F.3d 1308 (11th Cir. 2013) ........................................................ 33

*Smith v. R.J. Reynolds Tobacco Co.*,
    880 F.3d 1272 (11th Cir. 2018) ........................................................ 33

*Smith v. Sch. Bd. of Orange Cnty.*,
    487 F.3d 1361 (11th Cir. 2007) ........................................................ 61

*Smith v. St. Joseph's/Candler Health Sys., Inc.*,
    770 F. App'x 523 (11th Cir. 2019) .................................................... 52

*Sosa v. Airprint Sys., Inc.*,
    133 F.3d 1417 (11th Cir. 1998) ........................................................ 61

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .......................................................................... 39

*Stevens v. Gay*,
    864 F.2d 113 (11th Cir. 1989) .......................................................... 61

*Swain v. Credit One Bank, N.A.*,
    No. 17-CV-00751, 2019 WL 10837767 (N.D. Ga. June 4, 2019) ........ 53

*Taylor v. Freeman*,
    447 F. App'x 78 (11th Cir. 2011) ...................................................... 16

*TocMail, Inc. v. Microsoft Corp.*,
    67 F.4th 1255 (11th Cir 2023) .......................................................... 39

*Tsavaris v. Pfizer, Inc.*,
    717 F. App'x 874 (11th Cir. 2017) .................................................... 81

*United States v. Campbell*,
    26 F.4th 860 (11th Cir. 2022) .......................................................... 59

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020) .......................................................................... 59

*Williams v. Mosaic Fertilizer, LLC*,
    889 F.3d 1239 (11th Cir. 2018) ........................................................ 66

## Statutes and Regulations

21 U.S.C. § 337 ................................................................. 13, 70, 82

21 U.S.C. § 351 ............................................................................ 10

21 U.S.C. § 352 ........................................................................ 5, 10

21 U.S.C. § 355 ............................................................................ 76

21 U.S.C. § 360k .......................................................................... 74

21 U.S.C. § 379r ...................................................................... *passim*

21 C.F.R. § 201.66 ...................................................................... 76

21 C.F.R. § 314.50 ...................................................................... 79

21 C.F.R. § 314.70 ................................................................. 65, 79

21 C.F.R. §§ 314.80-81 .............................................................. 79

Fed. R. Civ. P. 16 ....................................................................... 61

Fed. R. Civ. P. 23 ....................................................................... 16

Fed. R. Civ. P. 56 .................................................................. *passim*

Fed. R. Evid. 702 ................................................................... *passim*

U.S. Constitution, Art. III .................................................... *passim*

## Other Authorities

James O'Reilly, *et al.*, *OTC Drug Review Program—
   Overview*, Food and Drug Admin. § 13:37 (2023) ................................ 7

# INTRODUCTION

Throughout years of litigating this MDL, Plaintiffs' sole theory of standing and liability was that Zantac's label did not disclose the risk of cancer due to allegedly dangerous levels of N-Nitrosodimethylamine ("NDMA"), and that Zantac was therefore "misbranded" and worthless. On that basis, Plaintiffs' economic-loss class action sought a full refund of the purchase price of Zantac. Plaintiffs' medical-monitoring class action demanded payment for future medical screening due to an allegedly significantly increased risk of cancer. The assertion that Zantac use caused cancer was the linchpin of both putative class-action complaints. But after two years of fact and expert discovery, Plaintiffs lacked reliable expert evidence that Zantac causes cancer.

The district court correctly found that, without admissible evidence that Zantac use causes cancer, Plaintiffs could not prove their theory of Article III standing for their economic-loss claims. And Plaintiffs conceded that they could not pursue their claims for medical monitoring without proof that medical tests were needed due to a significantly increased risk of cancer. After issuing notices under Federal Rule of Civil Procedure 56(f) and giving Plaintiffs two opportunities to show cause why

1

the putative class actions should continue, the district court properly entered summary judgment in the medical-monitoring class action and dismissed the economic-loss class action. *See* Standing & Summary Judgment Order, MDL.Dkt.6795:28-29.[2]

The district court was also correct that Plaintiffs could not pursue new, unpleaded claims based on the theory that alleged "adulteration" of Zantac with trace amounts of NDMA caused a partial loss of value, *i.e.*, a price-premium claim. Plaintiffs expressly disclaimed any price-premium claim that Zantac was "worth less," and they are bound by their strategic choice. Such a theory, in any event, is neither legally viable nor supported by the facts alleged or in the record.

Brand Defendants have cross-appealed because federal preemption forecloses Plaintiffs' claims relating to over-the-counter ("OTC") medications. Such claims are barred by express preemption under 21 U.S.C. § 379r, as well as implied preemption. Section 379r permits only a small category of state economic-loss claims that "parallel" violations of

---

[2] The district court pleadings are referred to as MDL.Dkt.[docket number]:[page]. Page references are to the blue page numbers in the header generated by the district court's e-filing system.

federal law. At the same time, only state-law claims that do not run afoul of federal law survive implied preemption. Here, federal law bars manufacturers from changing the formulation of a medication after approval by the U.S. Food and Drug Administration ("FDA") and forbids private enforcement of the Food, Drug, and Cosmetic Act ("FDCA"). Plaintiffs' attempt to craft a claim that could survive express and implied preemption led them to the theory that Zantac was "misbranded" and entirely "worthless"—a claim Plaintiffs did not and could not prove. In any event, as explained in the Conditional Cross-Appeal, federal preemption also should have barred Plaintiffs' misbranding claims from the outset.

This Court should affirm.

# STATEMENT OF THE ISSUES

## Appeal

1.  Whether the district court correctly dismissed the economic-loss putative class action after Plaintiffs failed to adduce admissible evidence that Zantac use causes cancer—their chosen theory of why Zantac was allegedly dangerous—to support their claims that they were injured because the Zantac they purchased was "misbranded" and "worthless."

2.  Whether the district court properly exercised its discretion in holding that Plaintiffs could not assert a new claim that Zantac was "adulterated" with trace amounts of NDMA and was thus "worth less" than the purchase price, as Plaintiffs did not plead or pursue that theory and, in any event, such a claim would be futile.

3.  Whether the district court correctly entered summary judgment in Defendants' favor in the medical-monitoring putative class action where Plaintiffs lacked reliable evidence that Zantac use causes cancer, much less that it causes a significantly increased risk of cancer for which physicians would preemptively prescribe a monitoring regimen.

## Conditional Cross-Appeal

Whether federal law preempts Plaintiffs' attempt to enforce the criminal "misbranding" statute in the FDCA, 21 U.S.C. § 352, by claiming that Brand Defendants rendered Zantac's FDA-approved label "misbranded" by failing to disclose the alleged risk of cancer due to unsafe NDMA levels.

## STATEMENT OF THE CASE

## I.  Factual Background

### A.  The FDA Repeatedly Evaluated and Approved Zantac as Safe and Effective.

Zantac, including its active ingredient ranitidine hydrochloride, was first approved by the FDA as a prescription medication in 1983 following extensive scientific evaluation for safety and efficacy. *See* Rule 702 Order, MDL.Dkt.6120:8. Before Zantac's approval, invasive surgery was the standard of care for treating ulcers. *See* MDL.Dkt.6164-2:795. Marking a significant advancement in medical treatment, Zantac offered a non-invasive alternative to surgery that significantly improved health outcomes for some patients compared to surgical methods. *Id.* In the decades that followed, Zantac and its generic counterparts became some of the most widely used medications in the United States due to their efficacy and positive safety profile. *See* Rule 702 Order, MDL.Dkt.6120:8-9. Zantac has been used to treat a range of conditions affecting the stomach and esophagus, such as ulcers, gastroesophageal reflux disease, heartburn, and indigestion. MDL.Dkt.6120:8.

The FDA has repeatedly engaged in thorough scientific reviews of Zantac's safety and efficacy, leading to its approval as an OTC medication

and approval for additional indications and dosages. *See, e.g.*, Rule 702 Order, MDL.Dkt.6120:8. Each new approval for OTC Zantac required FDA's review of safety and efficacy data, including ensuring consumers could safely use the product without medical supervision. *See* James O'Reilly, *et al.*, *OTC Drug Review Program—Overview*, Food and Drug Admin. § 13:37 (2023).

The right to market OTC Zantac in the United States has changed hands over the years, from GSK's predecessor to Pfizer's predecessor Warner-Lambert (1998), to Pfizer (2000), followed by Boehringer Ingelheim (2006), and then Sanofi (2017). *See* Rule 702 Order MDL.Dkt.6120:8-9.

## B.  Plaintiffs Swiftly Filed Suit After an Online Pharmacy, Using Extreme Testing Conditions, Reported Finding NDMA in Zantac Samples.

In 2019, Valisure, a private online pharmacy, subjected ranitidine to testing. MDL.Dkt.6120:3,9. Valisure found NDMA in ranitidine only under extreme conditions: Valisure heated Zantac to 266°F, far above the 98°F found in the human body. MDL.Dkt.6120:3. At normal body temperatures, Valisure did not detect NDMA. *Id*. Valisure also combined ranitidine with sodium nitrite, ostensibly to simulate human stomach

conditions, but used near-lethal levels of that salt. MDL.Dkt.6120:3-4. When Valisure adjusted the sodium nitrite to more normal quantities, no NDMA was found. MDL.Dkt.6120:4. Nonetheless, Valisure submitted a citizen petition to the FDA, requesting that ranitidine products be recalled. MDL.Dkt.6120:9.

Over the next few months, the FDA undertook its own testing of ranitidine from various manufacturers, and it found a range of NDMA levels: Some samples had none, others were within the FDA's guideline of 96ng/day, and a few registered NDMA above this guideline but still far below Valisure's findings. MDL.Dkt.6120:4.

The FDA's guideline for daily NDMA intake is conservative. If one were to consume 96ng of NDMA every day for 70 years, the FDA estimates the theoretical increased risk of cancer would be 1 in 100,000. MDL.Dkt.6120:5. NDMA is also ubiquitous in the environment; it is found in food, air, and water. The FDA found in ranitidine from preliminary tests barely exceed amounts one might expect to find in common foods. MDL.Dkt.6188-8:2.

As a precautionary measure, manufacturers voluntarily withdrew prescription and OTC Zantac and ranitidine from the market in

September-October 2019. *See* MDL.Dkt.6120:10. The FDA meanwhile determined that Valisure's testing methods were improper and artificially created NDMA by using extreme temperatures. MDL.Dkt.6120:4.

In April 2020, the FDA requested the voluntary withdrawal of all ranitidine products from the market. MDL.Dkt.6120:10. The FDA also commissioned a human clinical trial to determine whether ranitidine degrades into NDMA in the human body. MDL.Dkt.6120:5. That trial, completed in 2021, found no evidence of NDMA forming in the body after ranitidine use. *Id.*

Plaintiffs began filing personal-injury lawsuits the same day Valisure's citizen petition was published. *See* MDL.Dkt.6120:10. One of the first lawsuits was filed by the president of Valisure's brother-in-law, a plaintiffs' lawyer. MDL.Dkt.5272:2. In February 2020, the Judicial Panel on Multidistrict Litigation centralized for pretrial proceedings all federal ranitidine lawsuits before Judge Robin L. Rosenberg in the Southern District of Florida. MDL.Dkt.6120:10.

## II. Legal Background

### A. Federal Misbranding and Adulteration Statutes.

The FDCA directs the FDA to "deem[]" a drug "to be misbranded" if, *inter alia,* the medicine is "dangerous to health" even if it is "used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 352(j). Because FDA approval requires a finding that a new drug is "safe and effective," the FDA may only find a drug is misbranded based on new information not previously before the agency. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133-34 (2000).

A medicine is "adulterated" under the FDCA if, among other things, it "consists in whole or in part of any filthy, putrid, or decomposed substance," or has been "contaminated with filth," "rendered injurious to health" by unsanitary conditions, or if the methods and facilities used for its manufacturing, processing, packing, or holding do not conform to current good manufacturing practice, or do not ensure its safety, identity, strength, quality, and purity. 21 U.S.C. § 351(a)(1).

**B.   Express and Implied Preemption Under the FDCA.**

As described in the procedural history below, Plaintiffs pleaded and pursued narrow economic-loss claims premised on the assertion that Zantac was "misbranded" and "worthless" due to dangerous and carcinogenic levels of NDMA. Plaintiffs did so deliberately to avoid express and implied preemption, which leave only a "narrow gap" for non-preempted claims seeking economic recovery for FDA-approved OTC medications. *See Mink v. Smith & Nephew. Inc.*, 860 F.3d 1319, 1327 (11th Cir. 2017).[3] Federal preemption doctrine thus provides an important framework for understanding the history of the MDL, including why Plaintiffs limited themselves to the pursuit of certain claims and strategically abandoned other claims at the outset of the litigation.

The FDCA contains an express preemption provision governing FDA-approved OTC medications. Under the heading "National

---

[3] As detailed in the procedural history, Plaintiffs' economic-loss complaint survived motions to dismiss on this basis, with the district court finding that their "worthless" claim "paralleled" federal law and avoided express preemption. Brand Defendants' conditional cross-appeal, *infra*, explains that even this narrow window should have been unavailable to Plaintiffs under the circumstances of this case.

uniformity for nonprescription drugs," Section 379r mandates that "no State or political subdivision of a State may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription] drug …, and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under [the FDCA]." 21 U.S.C. § 379r(a). Accordingly, consumers cannot bring state-law claims for alleged economic harms relating to OTC products that would impose duties "different from," "in addition to," or "otherwise not identical with" a federal requirement under the FDCA. *Id.* In other words, to avoid express preemption, state-law claims must seek to hold defendants liable for conduct that would also constitute a violation of federal law.

Section 379r preempts not only state legislation and regulations, but also common-law duties imposed through civil damages that differ from or add to federal requirements. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324-25 (2008). Additionally, Congress provided in Section 379r(c)(2) that "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug" shall be deemed a state "requirement" that satisfies § 379r(a); *see, e.g.*, *Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp.

2d 1271, 1282 (C.D. Cal. 2008) (recognizing preemption of state-law claims "that require additional warnings in the advertising for nonprescription drugs, and not only on the labeling").

Meanwhile, state-law claims must also avoid implied preemption, which bars both (1) the imposition of state duties that are impossible for the defendant to perform under federal law, and (2) litigants' attempts to enforce the FDCA rather than pursue independent state-law duties. The FDCA provides that all actions to enforce its requirements "shall be by and in the name of the United States." 21 U.S.C. § 337(a). Accordingly, the FDA—not private citizens—has sole authority to enforce the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 (2001). Claims that seek to privately enforce the FDCA, rather than enforce independent and parallel state-law duties, are impliedly preempted. The Supreme Court held in *Buckman* that, under these principles, private parties cannot seek relief for purported "fraud on the FDA." *Id*. The Court observed that allowing a litigant to assert claims based on alleged federal violations would interfere "with the federal statutory scheme, which 'amply empowers the FDA to punish and deter fraud against the Administration.'" *Id.* at 348.

Only a small subset of potential claims related to OTC medications survive both express and implied preemption. *See Mink*, 860 F.3d at 1327 (recognizing that "these two types of preemption" together leave "a narrow gap for pleadings" (internal quotation marks omitted)).

## III. Procedural History

### A. The District Court Organized This MDL Through Case-Management Orders and Addressed Three Rounds of Complaints.

The district court skillfully managed this sprawling MDL. The court, with the parties' input and consent, organized the case schedule based on Plaintiffs' core allegation that Zantac use causes cancer and the understanding that Plaintiffs' claims were not viable without reliable evidence of general causation. *See* MDL.Dkt.875:2 (entering parties' proposed case management schedule centered on the general causation inquiry); MDL.Dkt.960:193 (One of Plaintiffs' four lead lawyers stating: "from the start date of discovery we would go 18 months on full discovery, no bifurcation, no phasing. At the end of that 18-month period, [Defendants] would file their general causation motions on *Daubert* in

the PI cases, we file our motions for class certification.").[4]

As is common in MDLs, the district court appointed a slate of lead Plaintiffs' counsel, which included the lead attorneys for the putative class actions. Plaintiffs' leadership was responsible for class discovery, general causation and expert discovery, and briefing. First Show-Cause Order, MDL.Dkt.6484:1 n.2. The court purposefully appointed counsel that could serve the different groups of Plaintiffs, including the putative classes and those alleging personal injury. MDL.Dkt.685:3,13-17.

### 1. In the first round of pleadings, Plaintiffs pursued a "misbranding" theory based on allegations that Zantac is worthless because it causes cancer.

Pursuant to this agreed structure, Plaintiffs' lead counsel filed three master complaints in June 2020: a putative class-action complaint that included economic-loss and medical-monitoring claims, MDL.Dkt.889, a personal injury complaint, and a third-party payor class complaint. Each complaint asserted a variety of state-law claims—all

---

[4] Similarly, other product liability MDL courts have organized discovery and dispositive motions around general causation. *In re Acetaminophen-ASD-ADHD Prods. Liab. Litig.*, No. 22-3043, 2023 WL 8711617, at *2 (S.D.N.Y. Dec. 18, 2023); *see also In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1033-34, 1050 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022).

hinging on Plaintiffs' central allegation that Zantac use causes cancer. *See, e.g.*, MDL.Dkt.889¶745.

Defendants moved to dismiss each complaint on several grounds, including impermissible shotgun pleading, preemption, and, for the economic-loss claims, lack of standing. MDL.Dkts.1580,1630. In a series of thorough orders, the district court dismissed the master complaints and directed Plaintiffs to refile their economic-loss and medical-monitoring claims in separate complaints. *See, e.g.*, MDL.Dkt.2515:48,54.[5]

The court also addressed the parties' preemption arguments. Brand Defendants argued that federal law, which forbids manufacturers from altering the formulation of approved medications, impliedly preempted

---

[5] The district court also dismissed certain economic-loss and medical-monitoring class action claims brought under the laws of several states. These were dismissed due to Plaintiffs' lacking standing, as none of the named Plaintiffs had brought claims under those states' laws. MDL.Dkt.2515:36-38. Although this dismissal treated a Rule 23 issue as one of standing, any such error became moot when the district court later dismissed all medical-monitoring and economic-loss claims based on Plaintiffs' failure to produce any admissible evidence that Zantac use causes cancer. MDL.Dkt.6795:29-30; *Taylor v. Freeman*, 447 F. App'x 78, 80 (11th Cir. 2011) ("[D]istrict court's error in failing to address [plaintiff's] illegal entry claim was harmless because that claim is also now barred[.]").

Plaintiffs' design-defect claims that alleged ranitidine should have been redesigned to eliminate any risk of NDMA formation. First Show-Cause Order, MDL.Dkt.6484:11-13; MDL.Dkt.1580:7-8. Brand Defendants also moved to dismiss the economic-loss claims involving OTC Zantac as expressly preempted under Section 379r, which bars non-personal injury claims that would impose requirements "different from, or in addition to" federal law and regulations. MDL.Dkt.1580:16-20.

Attempting to avoid express and implied preemption of their claims, Plaintiffs argued that Zantac was "misbranded" under federal law because it "causes cancer when used in accordance with the label." MDL.Dkt.1976:20-21. Plaintiffs' strategy relied on a footnote in *Mutual Pharmaceutical Co. v. Bartlett,* that, in dicta, suggested a plaintiff might avoid federal preemption of a claim based on an FDA-approved label if the plaintiff could prove the product was "misbranded." 570 U.S. 472, 487 n.4 (2013). Plaintiffs argued that both state and federal law impose the same duty not to sell a "dangerous" drug and, therefore, their "misbranding" claims should survive in the narrow gap between express and implied preemption. MDL.Dkt.1976:20-21.

The district court held that Plaintiffs' design-defect claims were barred by implied preemption because Brand Defendants could not alter Zantac's formulation without the FDA's approval. First Show-Cause Order, MDL.Dkt.6484:13 (citing MDL.Dkt.2532:19). Relying on Plaintiffs' "misbranding" theory, however, the district court found that federal law did not preempt the narrow claim that Zantac's label should have disclosed the alleged risk of cancer due to dangerous levels of NDMA. *Id*. As the court later observed, "plaintiffs did not raise an adulteration defense to pre-emption." MDL.Dkt.6484:15 (quoting MDL.Dkt.3715:20); MDL.Dkt.6484:12 (citing MDL.Dkt.1976).

Brand Defendants also challenged Plaintiffs' standing to bring economic-loss claims. MDL.Dkt.1630:26. Plaintiffs maintained that they incurred economic injury because "products that are so unsafe that they are illegal to buy or sell are also economically worthless." MDL.Dkt.2242:7. Citing *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019), which found the purchase of a then-illegal dietary supplement conferred standing, Plaintiffs argued that Zantac—like the supplement in *Debernardis*—had "no value" and was "worthless." MDL.Dkt.2242:15; *see also* MDL.Dkt.1980:10-11 (claiming economic

injury because ranitidine was a "worthless, dangerous drug"). The district court undertook a careful analysis of *Debernardis*, found Plaintiffs had sufficiently alleged Zantac was "worthless," but otherwise declined to conduct a substantive standing analysis at that juncture. MDL.Dkt.2515:43; Standing & Summary Judgment Order, MDL.Dkt.6795:3-4.

### 2. In the second round of pleadings, Plaintiffs committed to their "misbranding" theory.

Plaintiffs filed three new master complaints—an amended economic-loss class complaint, a medical-monitoring class complaint, and an amended personal injury complaint—with the unifying allegation that Zantac caused cancer and was "inherently defective and unreasonably dangerous," *see, e.g.*, MDL.Dkts.2832-1¶1313,2835¶2284.

When Brand Defendants moved to dismiss the economic-loss claims for lack of standing, Plaintiffs again maintained they incurred economic injury because Zantac caused cancer, rendering it "worthless." Standing & Summary Judgment Order, MDL.Dkt.6795:4-5,16-17. Plaintiffs contended that the "'fundamental premise' of their claims was that the ranitidine 'label needed to warn about the risk of NDMA and cancer.'" MDL.Dkt.6484:15 (quoting MDL.Dkt.3325:14-15). Plaintiffs claimed that

19

they purchased Zantac "*without* knowing ranitidine causes cancer," and they "*would not have* made these purchases if they had known that it did cause cancer." MDL.Dkt.6795:4 (quoting MDL.Dkt.3429:35-36).

At argument, the district court sought clarity as to whether Plaintiffs were also claiming economic injury because Zantac, although holding some value greater than zero, was "worth less" than the purchase price. MDL.Dkt.6795:16-17. When questioned by the court, Plaintiffs disavowed any such price-premium claim:

> THE COURT: Are you putting that forth as a theory, the worth less, two words? I know you are saying it is subsumed, but I think the Defense should know what you are arguing right now.
>
> MS. FEGAN: Your Honor, when I think of worth less as two words, I think of drug price premium cases, and ***I will commit this is not a price premium case***, this is not about a slight overcharge and what it would have cost versus a competitor. ***We are talking about a drug that was recalled because it causes cancer, and in that context we are saying it as one word, it is worthless.***

*Id.* (quoting MDL.Dkt.3682:190) (emphases added). Plaintiffs reiterated their theory of economic injury: Zantac was "misbranded" because its label did not disclose that it contained carcinogenic NDMA, which made it "worthless." MDL.Dkt.6795:4-5 (citing MDL.Dkt.3682:173). Plaintiffs

did not argue that they had standing because Zantac was "adulterated." MDL.Dkt.6795:13.

Evaluating Plaintiffs' theory of economic injury that alleged Zantac was "misbranded, unsafe, and worthless," the district court determined that Plaintiffs had sufficiently alleged standing for their amended economic-loss complaint to proceed through the motion-to-dismiss stage. MDL.Dkt.6795:6 (citing MDL.Dkt.3720:51-53). After carefully analyzing this Court's decision in *Debernardis*, the court explained that "at this procedural juncture, the Plaintiffs have plausibly alleged economic injury-in-fact through purchasing *worthless* drugs that contained NDMA and were *misbranded*, and which the Plaintiffs would not have purchased but for the Defendants' conduct." MDL.Dkt.3720:51 (emphases added). The district court thus declined to dismiss labeling-based claims against Brand Defendants that sold OTC Zantac, finding these claims were not expressly preempted by federal law. MDL.Dkt.3715:50. The district court informed Plaintiffs that it would reexamine the question of standing at future stages in the litigation "[w]ith a more fully developed factual record." MDL.Dkt.3720:55,36.

**3. In the third round of pleadings, Plaintiffs again alleged they were injured because Zantac caused cancer and was therefore worthless.**

In August 2021, Plaintiffs amended their three master complaints for the last time:

(1) In the second amended economic-loss complaint ("SAELC"), individuals who purchased Zantac sought refunds of the purchase price—alleging that they "would not have purchased" Zantac had they known "of the true increased risks and serious dangers of taking the drugs." MDL.Dkt.3883¶323. As the district court later explained, "every claim pled in the SAELC rest[ed] on the allegation that the NDMA in ranitidine could cause cancer." Standing & Summary Judgment Order, MDL.Dkt.6795:11.

(2) In the amended medical-monitoring complaint, individuals who used Zantac but had not been diagnosed with cancer alleged that Zantac "significantly increased their … risk of cancer." MDL.Dkt.3884:13.

(3) In the second amended personal injury complaint, individuals who took Zantac alleged that the medicine caused them to develop cancer. MDL.Dkt.3887:1.

Brand Defendants moved to dismiss all of Plaintiffs' misbranding claims involving OTC Zantac in the SAELC as impliedly preempted under this Court's opinion in *Mink*, 860 F.3d at 1327-30. MDL.Dkt.4487:12-13. The motion explained that, by challenging an FDA-approved product label for failure to disclose a purported danger to FDA, Plaintiffs were asserting the type of failure-to-warn-the-FDA claim that must be rejected under *Mink* and *Buckman*, 531 U.S. at 350. MDL.Dkt.4107:11-20. The district court's order declining to dismiss these claims, MDL.Dkt.4487:14-16, is the subject of Defendants' conditional cross-appeal.

## B. The Parties Completed Years of Fact and Expert Discovery.

To resolve cross-cutting questions affecting all claims, the parties created a case management plan that prioritized the question of general causation, *i.e.*, whether Zantac use causes cancer in humans. Standing & Summary Judgment Order, MDL.Dkt.6795:1. The district court implemented the plan. The court gave Plaintiffs' lead counsel ample time and opportunity to develop experts and select the cancers for which they believed they could submit reliable evidence of causation. After initially saying that ranitidine caused ten cancers, Plaintiffs' leadership retreated

23

to five cancers: bladder, esophageal, gastric, liver, and pancreatic cancers ("designated cancers"). Rule 702 Order, MDL.Dkt.6120:14-15. They did not try to prove general causation for other types ("non-designated cancers"), and two of their expert witnesses opined that ranitidine use does *not* cause any non-designated cancers. First Show-Cause Order, MDL.Dkt.6484:6 (citing MDL.Dkt.6299); MDL.Dkts.6171-9(Krause.App.111:43),6179-6(Krause.App.116:33).

The parties began discovery in June 2020. Rule 702 Order, MDL.Dkt.6120:14 (citing MDL.Dkt.875:3). Discovery as to general causation, manufacturing, marketing, and other theories of liability involved more than one hundred depositions of expert witnesses, Brand Defendants' employees, and third parties like Valisure, as well as the production of millions of pages of regulatory and corporate documents and emails. *See* MDL.Dkt.6719:5. Defendants also took 116 depositions of putative class representatives and third-party healthcare providers. *See id*. The economic-loss Plaintiffs produced scant evidence of their out-of-pocket costs for Zantac. The parties collected medical and pharmacy records for these Plaintiffs and exchanged written discovery. Fact

discovery in the putative class actions closed in July 2022. MDL.Dkt.6719:6.

### C. The District Court Held Plaintiffs Lacked Reliable Evidence That Zantac Causes Cancer.

Brand Defendants moved to exclude the opinions of Plaintiffs' general causation experts for employing unreliable methodologies in assessing the scientific evidence, and they moved for summary judgment on all personal injury claims that alleged Zantac could cause any of the five designated cancers.[6] MDL.Dkt.6120:15,18.

In December 2022, after a thorough review of the evidence and experts and multiple days of hearings, the district court excluded Plaintiffs' experts' general causation opinions as unreliable and determined that Plaintiffs lacked admissible evidence to support their allegation that Zantac causes cancer. MDL.Dkt.6120:336-37. Brand Defendants incorporate their discussion of the court's Rule 702 order in

---

[6] Given the MDL's organization, the general causation experts were presented on behalf of the personal injury plaintiffs asserting designated cancers. Counsel for the putative class actions also served as lead counsel for all MDL Plaintiffs. MDL.Dkt.6484:1 n.2. These attorneys, with their experts, had months to select the cancers they would litigate and the expert opinions they would proffer.

25

their *Krause* brief at pages 34-37, 53-117. Based on the lack of admissible evidence of general causation, the district court also granted Brand Defendants' motion for summary judgment on the designated cancer Plaintiffs' personal-injury claims. Rule 702 Order, MDL.Dkt.6120:336.

### D. After the District Court Found No Reliable Evidence That Zantac Causes Cancer, the Putative Class Actions Unraveled.

Plaintiffs acknowledged that the district court's Rule 702 order foreclosed their medical-monitoring claims and was highly problematic for their economic-loss claims. *See* MDL.Dkt.6148:2-3. Accordingly, they moved to stay their putative class cases pending appeal. *Id.*

Plaintiffs contended that the economic-loss claims could survive in modified form based on allegations (not previously asserted) that Zantac was "adulterated" with trace NDMA levels and therefore "worth less," though not "worthless." MDL.Dkt.6254:4; MDL.Dkt.6148:4. Submitted more than three years into litigation, this was the first time Plaintiffs asserted "adulteration" or suggested a price-premium claim that Zantac was "worth less" due to trace amounts of NDMA. The district court initiated a show-cause process requiring Plaintiffs to demonstrate the viability of their claims in light of the Rule 702 order.

The district court began the show-cause process by issuing a thorough Rule 56(f) notice, giving Plaintiffs nearly a month to show cause why their economic-loss class claims should not be dismissed as a matter of law given the evidentiary record, including the absence of reliable evidence that Zantac can cause cancer. First Show-Cause Order, MDL.Dkt.6484:6,2. In a section titled "Plaintiffs' standing after the *Daubert* ruling," the court identified the lack of proof of cancer causation as an undisputed material fact relevant to standing. MDL.Dkt.6484:23-25.

The district court also highlighted Plaintiffs' prior statements that their case hinged on proof that Zantac was "worthless." MDL.Dkt.6484:16-17. The court observed that, if Zantac use does not cause cancer, a reasonable juror would not "conclude that the value of [Zantac] was zero," and directed Plaintiffs to show cause why the economic-loss claims should not be dismissed for lack of standing given the "summary judgment record evidence." MDL.Dkt.6484:17.

The court also directed Plaintiffs to address whether their newly proposed adulteration theory "departs so strongly from the SAELC that, in order for Plaintiffs to pursue [it], the SAELC must be amended."

27

MDL.Dkt.6484:17-18. Furthermore, the court asked Plaintiffs to clarify their adulteration theory, including how Zantac could be considered "adulterated" under federal law when the record showed that it was not contaminated with NDMA through external processes but that its active ingredient had the potential to degrade and create low levels of NDMA over time. MDL.Dkt.6484:22.

Plaintiffs' response to the first show-cause order dodged many of the district court's threshold inquiries. Standing & Summary Judgment Order, MDL.Dkt.6795:14. The court therefore issued a second show-cause order. Second Show-Cause Order, MDL.Dkt.6639:1.

In the second show-cause order, the court directed Plaintiffs to address questions that their initial response ignored, including: (1) "how they have not abandoned the contention" that Zantac was merely "worth less" than the purchase price, given their prior statements disavowing such a claim, MDL.Dkt.6639:2-3; (2) how they could claim Zantac was "worthless" when there is no evidence that trace amounts of NDMA in

Zantac cause cancer,[7] MDL.Dkt.6639:4; and (3) whether Plaintiffs' adulteration theory, focusing on contamination rather than harm, diverged from the SAELC such that litigating it would require amendment, and, if so, whether doing so would be "fair and equitable … after the completion of discovery and the issuance of the Court's *Daubert* ruling." MDL.Dkt.6639:5. The court provided seven days for Plaintiffs' second opportunity to address its questions. MDL.Dkt.6639:9. Ten days later, after the court extended the response deadline *sua sponte*, Plaintiffs responded without requesting additional time; instead, they inaccurately accused the district court of failing to identify material facts in its show-cause orders. *See* MDL.Dkts.6640(Adams.App.II:111-12);6676:12-13.

After Plaintiffs' response to the second show-cause order, the district court dismissed the economic-loss and medical-monitoring actions. Standing & Summary Judgment Order, MDL.Dkt.6795:1. It entered summary judgment for the Brand Defendants on the medical-

---

[7] The court noted that if Plaintiffs were alleging any harms beyond cancer, they needed to specify the supporting paragraphs in the SAELC. Second Show-Cause Order, MDL.Dkt.6639:4.

monitoring claims because Plaintiffs conceded those claims were not viable in light of the Rule 702 order. MDL.Dkt.6795:29-30.

Turning to the economic-loss claims, the district court observed that, throughout the MDL proceedings, Plaintiffs' theory of economic injury rested on the assertion that Zantac was carcinogenic and misbranded, and, as a result, worthless. MDL.Dkt.6795:5. The court found that, without reliable evidence of cancer causation, Plaintiffs effectively conceded that they could no longer provide a basis for standing for their economic-loss claims. MDL.Dkt.6795:10-12. And "[b]ecause the Plaintiffs' theory of standing based on misbranding is the only theory [they] have relied on in over three years of litigation," the court dismissed Plaintiffs' economic-loss class action claims for lack of standing. MDL.Dkt.6795:12-13.

"In the alternative," the district court evaluated Plaintiffs' new adulteration-based theory and found that it also was not viable. MDL.Dkt.6795:13,30. The court found that Plaintiffs had abandoned any claim that Zantac was unsafe for a reason other than cancer and had any value above zero—*i.e.*, was "worth less." MDL.Dkt.6795:16-18. The court noted that it twice asked Plaintiffs to address their abandonment of the

argument that Zantac was "worth less," but Plaintiffs failed to do so. MDL.Dkt.6795:13 n.8.

In light of Plaintiffs' waiver of a "worth less" theory and failure to plead such a diminution of value due to "adulteration," the district court held that Plaintiffs would need leave to amend the SAELC to pursue their new theory of economic injury. MDL.Dkt.6795:20-21. It observed that although the 1121-page SAELC contained a small number of allegations regarding adulteration, "Plaintiffs' adulteration-based standing theory is … new." MDL.Dkt.6795:10 n.7.

Because Plaintiffs' show-cause responses maintained that they "neither needed nor wanted an amended pleading," the district court determined that it "could end [its] inquiry into standing." MDL.Dkt.6795:20-21. The court explained: "Plaintiffs' prior misbranding theory of standing fails; the SAELC does not support the Plaintiffs' new adulteration theory; and, [even if requested] the Court [would] not permit yet another amendment." MDL.Dkt.6795:21. The court stressed that permitting Plaintiffs to amend again, after more than two hundred depositions, would be "unfairly prejudicial to the Defendants, who would be surprised to have to defend against an entirely new standing theory,

premised on a new theory of recovery that does not rely on cancer, over three years into this MDL" and after fact discovery closed. *Id.*

The district court also held that Plaintiffs' adulteration theory of standing was not viable as a matter of law for multiple reasons. MDL.Dkt.6795:21. First, distinguishing *Debernardis v. IQ Formulations, LLC* because it involved a product that was presumptively adulterated, the court found that Plaintiffs lacked standing to sue based on mere buyer's remorse. MDL.Dkt.6795:26-27. The court then found that Plaintiffs could not explain how Zantac was "adulterated" under federal law when it was not "contaminated" through, *e.g.*, the manufacturing process, but rather, the FDA-approved active ingredient had the potential to degrade into trace amounts of NDMA over time. MDL.Dkt.6795:23. Moreover, Plaintiffs could not rely on FDA's 96ng acceptable daily intake guideline, which was established in 2019, to prove adulteration because the guideline postdated Plaintiffs' economic-loss claims, and Plaintiffs did not explain why it was retroactive. MDL.Dkt.6795:21-22.

Having concluded that Plaintiffs could not pursue an adulteration theory, the district court dismissed without prejudice the economic-loss claims for lack of standing. MDL.Dkt.6795:30.

This appeal followed.

## STANDARD OF REVIEW

When a district court dismisses for lack of standing, this Court reviews its legal conclusions de novo and its factual findings for clear error. *McCullum ex rel. D.F. v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141 (11th Cir. 2014). Grants of summary judgment are reviewed de novo, and may be upheld by this Court "on any basis supported by the record." *Id.*

The Court reviews for abuse of discretion "the district court's application of waiver," *Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1280 (11th Cir. 2018), its docket-management decisions, *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1320 (11th Cir. 2013), and its judgment that amendment would be unfair and prejudicial, *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1286 (11th Cir. 2003).

# SUMMARY OF THE ARGUMENT

I.    The district court carefully managed years of discovery and pretrial proceedings to answer the question at the heart of Plaintiffs' theory of economic injury: Can Zantac use cause cancer? Rule 702 Order, MDL.Dkt.6120:13-14. After extensive discovery, the court correctly concluded that Plaintiffs failed to show Zantac can cause the five designated cancers selected by Plaintiffs' lead counsel. Standing & Summary Judgment Order, MDL.Dkt.6795:7 (citing MDL.Dkt.6120). Following a summary judgment show-cause process, the court held that the putative economic-loss class Plaintiffs were unable as a matter of law to prove their asserted injury—that is, that they sustained loss because they purchased a "misbranded" cancer-causing, and thus worthless, medicine. At summary judgment, the district court thus correctly dismissed Plaintiffs' economic-loss claims given their inability to demonstrate that Zantac was carcinogenic and worthless.

Plaintiffs' appeal rests on the flawed premise that their claims should have been treated as if they were still at the pleading stage where general factual allegations suffice. Adams.Br.35. But this litigation had moved well beyond the pleading stage, and the district court

appropriately proceeded to summary judgment as permitted by Rule 56(f).

Plaintiffs' argument that the district court erred in entering summary judgment due to a lack of notice and opportunity to respond is plainly contradicted by the record. In accordance with Rule 56(f), the court gave Plaintiffs ample notice and time—and Plaintiffs never sought an extension—to respond to the court's show-cause orders, which identified the undisputed material facts and detailed the pertinent legal questions. Plaintiffs were afforded two attempts spanning two months to address the court's concerns about their theory of standing, their waiver of alternate theories, and other deficiencies in their claims. The court correctly concluded that Plaintiffs failed to show cause why their claims should not be dismissed.

II.   The district court also properly refused to allow Plaintiffs to pursue an unpleaded, abandoned, and futile "adulteration" claim based on a new theory that they paid a "price premium" for Zantac because it may break down over time to form trace levels of NDMA, making Zantac "worth less," albeit not "worthless."

As an initial matter, Plaintiffs abandoned any price-premium theory based on purported "adulteration" when they stated in open court that they "*commit* this is not a price premium case, this is not about a slight overcharge and what it would have cost versus a competitor. *We are talking about a drug that was recalled because it causes cancer, and in that context we are saying it as one word, it is worthless.*" Standing & Summary Judgment Order, MDL.Dkt.6795:16-17 (quoting MDL.Dkt.3682:190) (emphases added). Plaintiffs disclaimed their "adulteration" theory for strategic reasons, including their effort to avoid express and implied preemption during the motion-to-dismiss stage. Plaintiffs could not raise it at summary judgment after they had failed to prove that Zantac causes cancer and was therefore worthless—the only theory of injury and liability that they pleaded and pursued.

Plaintiffs, moreover, never sought leave to amend their complaint in response to the district court's show-cause orders. Even if they had (or challenged this ruling on appeal), the court properly concluded that such a belated amendment would have been prejudicial years into the litigation and after fact discovery closed. Under these circumstances, Plaintiffs cannot resurrect this long-abandoned claim on appeal.

The adulteration theory is a dead end, in any event, as the district court correctly found. Without evidence that the Zantac purchased by Plaintiffs had dangerous levels of NDMA, Plaintiffs would be left with mere "buyer's remorse," which does not confer standing to sue under the facts alleged here. *See In re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 280-81 (3d Cir. 2018). Additionally, Plaintiffs could not show Zantac was "adulterated" under federal law where any trace amounts of NDMA were not introduced by external contamination, but purportedly created by degradation over time of the active ingredient in Zantac's FDA-approved formulation. Standing & Summary Judgment Order, MDL.Dkt.6795:23. Plaintiffs also could not establish "adulteration" since they have no reliable evidence that they purchased Zantac pills with NDMA in levels above the FDA's guidelines, which were not even issued until 2019, *after* their alleged economic losses. MDL.Dkt.6795:21-22.

III.   The district court correctly dismissed Plaintiffs' medical-monitoring claims because Plaintiffs do not have any admissible evidence that Zantac can cause cancer, much less that it substantially increased the risk of cancer in a manner that would lead physicians to prescribe a

medical-monitoring regimen—the minimum threshold for a medical-monitoring claim. Plaintiffs concede that the court's ruling on general causation disposes of their medical-monitoring claims. Their only basis to appeal the medical-monitoring claims is their parallel appeal of the Rule 702 order. That ruling, however, was correct for all the reasons stated in Brand Defendants' *Krause* brief.

## ARGUMENT

### I. The District Court Properly Dismissed Plaintiffs' Economic-Loss Claims Because Plaintiffs Lacked Standing and Could Not Show Zantac Can Cause Cancer and Was Therefore "Worthless."

The district court correctly dismissed the economic-loss claims when, after years of discovery, Plaintiffs could not proffer admissible evidence that Zantac caused cancer or contained dangerous levels of NDMA, and thus had no basis for their claim of economic injury from purchasing a cancer-causing—and thus objectively worthless—medication. Standing & Summary Judgment Order, MDL.Dkt.6795:28-29; MDL.Dkt.6795:22 (explaining that "Plaintiffs attempted, but were unable, to put forward reliable evidence to prove that [Zantac] was unsafe").

To have standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

At summary judgment, a plaintiff must not only plead standing, but also "needs *evidence* of Article III standing." *TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1267 (11th Cir 2023). Each standing element must be supported "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (requiring plaintiffs to "set forth by affidavit or other evidence specific facts" to demonstrate standing at summary judgment (internal quotation marks omitted)).

Where plaintiffs fail to support their pleaded basis for standing, courts do not hesitate to grant summary judgment. *See id.* at 578 (dismissing at summary judgment because plaintiffs could not factually support their standing theory-of-injury); *TocMail*, 67 F.4th at 1265-67 (entering summary judgment for defendant based on a lack of injury-in-fact where plaintiffs' allegations "never found support in the record").

Here, after issuing show-cause orders pursuant to Rule 56(f), the district court correctly concluded that Plaintiffs could not demonstrate their alleged injury and therefore dismissed the economic-loss claims for lack of standing at summary judgment.

As the history of the MDL makes clear, Plaintiffs err in suggesting that the district court should have applied the motion-to-dismiss standard at this stage of the litigation. Adams.Br.26-28,35. Where, as here, Plaintiffs "had more than enough time to take any steps necessary to ensure that [they] would be able to prove standing," the pleading standard no longer applies. *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1286 (11th Cir. 2019) (applying summary judgment standard and finding no standing); *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 882 n.8 (11th Cir. 2000) (applying summary judgment standard to the question of standing where the case had "moved well beyond the preliminary stages").

A.   **Plaintiffs Could Not Prove Their Sole Theory of Economic-Loss Injury—That Zantac Was "Misbranded" and "Worthless" Because It Caused Cancer.**

Throughout this years-long litigation, Plaintiffs committed to a single theory of standing for their alleged economic-loss injuries: Zantac

40

was "misbranded" and "worthless" because it caused an undisclosed risk of cancer. *See* Standing & Summary Judgment Order, MDL.Dkt.6795:5 ("[T]o prove that the Plaintiffs had suffered an economic injury-in-fact and therefore had standing to sue, they argued that [Zantac]: could cause cancer; was unsafe; was misbranded since its label failed to disclose that the product was unsafe; should not have been sold; and, as a result, was worthless."). Plaintiffs' counsel insisted, in opposing Defendants' motions to dismiss, that "this is not a price premium case, this is not about a slight overcharge …. We are talking about a [worthless] drug that was recalled because it causes cancer." Second Show-Cause Order, MDL.Dkt.6639:2 (quoting MDL.Dkt.3682:190); *see also* Standing & Summary Judgment Order, MDL.Dkt.6795:5 ("Plaintiffs never made any other arguments in support of their standing to sue during the multiple rounds of motions to dismiss."); MDL.Dkt.6795:5-6 (Plaintiffs "did not contend that [Zantac] causes any harm other than cancer" or had any value "greater than zero."); MDL.Dkt.6795:16 ("Plaintiffs confirmed to the Court at oral

argument that their claims were focused on cancer as the only potential harm in this MDL[.]").[8]

During the show-cause process, the district court gave Plaintiffs every opportunity to explain how they could assert standing without evidence that Zantac causes cancer; but Plaintiffs failed to defend their standing to bring the claims as pleaded. After Plaintiffs "did not answer some of the Court's questions on the issue of standing" in response to the court's first show-cause order, the district court's second show-cause order put these questions pointedly to Plaintiffs:

> Plaintiffs state that they have standing because they purchased ranitidine and it was worthless, but they do not explain why it was worthless. The Plaintiffs also do not grapple with their earlier position that ranitidine was worthless only on account of its alleged cancer-causing propensity. The Plaintiffs must explain to the Court their

---

[8] As discussed *infra*, Plaintiffs adopted this narrow theory of liability in a deliberate strategy to defend against Brand Defendants' federal preemption arguments. First Show-Cause Order, MDL.Dkt.6484:8-9. Seeking to leverage footnote 4 in *Bartlett*, 570 U.S. at 487, Plaintiffs argued that they could avoid express and implied preemption by showing that Zantac's FDA-approved label could still render the product "misbranded" if information undisclosed to the FDA indicated the drug was "dangerous to health." MDL.Dkt.1976:20 (quoting 21 U.S.C. § 352(j)). As the district court recognized, proof that Zantac was "dangerous" because it caused cancer was essential to Plaintiffs' strategy, and Plaintiffs survived multiple motions to dismiss on this basis. First Show-Cause Order, MDL.Dkt.6484:11-16.

> theory of injury in fact, if their theory is an injury other than cancer, and inform the Court where in their pleadings they have pled such a theory and in what filings they have pursued such a theory.

Second Show-Cause Order, MDL.Dkt.6639:2,4 (internal quotation marks and citations omitted). The district court found that, instead of responding to its questions, "[t]he Plaintiffs d[id] not defend their previously held misbranding theory." Standing & Summary Judgment Order, MDL.Dkt.6795:10. As the court explained, the failure of Plaintiffs' pleaded claims directly followed from the court's Rule 702 order, which found that Plaintiffs have no reliable evidence that Zantac is dangerous or causes cancer:

> Plaintiffs may have chosen not to defend their misbranding theory because the theory fails without proof that ranitidine is unsafe. The Plaintiffs pled that ranitidine was misbranded because its label failed to disclose that it could cause cancer; every claim pled in the SAELC rests on the allegation that the NDMA in ranitidine could cause cancer. Without proof of cancer causation, the Plaintiffs cannot succeed in proving their claims as pled.

MDL.Dkt.6795:12 (citation omitted).

The district court was further correct that, without evidence that Zantac was dangerous or was "illegal to sell," Plaintiffs could not prove complete "worthlessness" based on a subjective claim of "buyer's

43

remorse"—that is, an unsubstantiated belief that the possible presence of NDMA, although unconnected to cancer, deprived the medicine of any value. MDL.Dkt.6795:27-29; *see, e.g.*, *Johnson & Johnson*, 903 F.3d at 281 ("[B]uyer's remorse, without more, is not a cognizable injury under Article III of the United States Constitution."); *In re Plum Baby Food Litig.*, 637 F. Supp. 3d 210, 223-25 (D.N.J. 2022) (finding no standing where plaintiffs alleged presence of heavy metals in baby food reduced or eliminated the value of the product but lacked "factual support of adverse health consequences"); *In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig.*, 831 F. Supp. 2d 507, 511-12 (D. Mass. 2011) (finding no standing where plaintiffs purchased products containing levels of lead too low to pose unacceptable health risk and were unable to show any actual harm). As the district court explained, beliefs disconnected from evidence of harm to human health cannot support an assertion of worthlessness. MDL.Dkt.6795:28.

It was entirely proper, moreover, for the district court to have evaluated standing based on the claims as pleaded and pursued, not based on theoretical alternative claims. This Court's decisions hold plaintiffs to their *actual* allegations when analyzing whether they have

standing to bring their pleaded claims. For example, in *Doss v. General Mills, Inc.*, the panel recognized that the plaintiff might have argued that the alleged presence of a probable carcinogen, glyphosate, in Cheerios "lowers the value." 816 F. App'x 312, 314 (11th Cir. 2020). However, much like Plaintiffs here, the plaintiff in *Doss* claimed the presence of trace glyphosate "renders Cheerios unsafe to eat" and "worthless." *See id.* The panel affirmed the dismissal for lack of standing because the plaintiff's "allegations do not match her underlying theory" of standing, *i.e.*, she "has not alleged that she purchased any boxes of Cheerios that contained any glyphosate, much less a level of glyphosate that is so harmful the Cheerios are 'presumptively unsafe' and therefore worthless."[9] *Id.* (quoting *Debernardis*, 942 F.3d at 1086). *Doss* affirmed a dismissal at the motion to dismiss stage; at summary judgment, it is even more important to hold Plaintiffs to their theory of standing that they not only pleaded,

---

[9] Other courts similarly make clear that plaintiffs' standing must be judged by their own complaint, and they are held to the allegations they actually plead. *See, e.g.*, *Johnson & Johnson*, 903 F.3d at 290 ("Today, we therefore explicitly hold what might heretofore have been obvious: a plaintiff does not have Article III standing when she pleads economic injury from the purchase of a product, but fails to allege that the purchase provided her with an economic benefit worth less than the economic benefit for which she bargained.").

but also committed to in defending against multiple motions to dismiss and through years of litigation and discovery.

Plaintiffs therefore get nowhere citing various cases for the general proposition that "*monetary* injury" can suffice to establish Article III standing. *See* Adams.Br.23-24. Nor does the fact that individual Plaintiffs in this MDL *alleged some* economic injury mean that the economic-loss class action Plaintiffs could *prove their asserted injury*. *Cf.* Adams.Br.26 (citing *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 21-10335, 2022 WL 16729170, at *1 (11th Cir. 2022) (per curiam) (holding that self-insured employers plausibly *pleaded* standing by asserting they paid for "worthless" drugs). To have survived summary judgment, the economic-loss class Plaintiffs were required (and failed) to identify reliable evidence for their allegations supporting their standing to bring the action, which depended on their now-unsubstantiated allegations that Zantac caused cancer, was "misbranded," and "worthless."

This Court's decision in *Debernardis v. IQ Formulations, LLC* does not help Plaintiffs and is consistent with the district court's approach of evaluating whether Plaintiffs substantiated their allegations of standing. *Debernardis* involved allegations that a dietary supplement was

worthless because it was contaminated with an ingredient banned by the FDA. 942 F.3d at 1082. In evaluating standing for an economic-loss claim, the Court recognized that the plaintiffs would ultimately be required to prove both that the supplement was adulterated and that it was unsafe for consumption. But the Court held that—for purposes of deciding a motion to dismiss—it was sufficient that plaintiffs alleged adulteration because dangerousness could be presumed at that stage. *See id.* at 1085. Judge Sutton's concurrence advised, moreover, that "[a]t summary judgment, each claimant will need evidence to back the point up. Why was the product worthless to each of them? How did it deliver less than expected? … The answers to these questions and others will determine whether the case may proceed further." *Id.* at 1090 (Sutton, J., concurring).

This is exactly what the district court did here. At the pleading stage, the district court carefully applied *Debernardis* to Plaintiffs' allegations that Zantac was dangerous and worthless, denied Brand Defendants' motion to dismiss, and allowed Plaintiffs to attempt to prove

their injury.[10] *See* MDL.Dkt.3720:50-55. The district court, however, cautioned Plaintiffs that its decision on the motion to dismiss "does not settle the issue of standing for the remainder of the case," that the court "has the duty to re-examine standing at every juncture of the case," and that the court would reevaluate whether Plaintiffs established standing "[w]ith a more fully developed factual record." MDL.Dkt.3720:53-55. After the close of two years of fact discovery, MDL.Dkt.6120:14, the district court dismissed Plaintiffs' claims. The court's dismissal on that basis was proper and well supported. *See* Standing and Summary Judgment Order, MDL.Dkt.6795:26-30. This Court should thus affirm the district court's dismissal of Plaintiffs' economic-loss class claims for lack of standing.

---

[10] Even at the pleading stage, the district court noted, however, an important distinction between this case and *Debernardis*. Whereas in *Debernardis*, "the FDA had warned the manufacturers (before they sold the supplements) that the supplements were illegal to sell," here, in contrast, "ranitidine was legal to sell and the FDA never instructed the Defendants to stop selling ranitidine before the FDA requested that the Defendants voluntarily recall the drug. Since ranitidine was legal to sell, the Court determined that the Plaintiffs must rely on other caselaw to support their standing position." Standing & Summary Judgment Order, MDL.Dkt.6795:4 (recounting the procedural posture (citing *Debernardis*, 942 F.3d at 1082, 1085)).

**B.** **Alternatively, This Court May Affirm Because the Economic-Loss Complaint Could Have Been Properly Rejected on the Merits.**

If this Court were to conclude that the district court erred by categorizing its dismissal as one based on standing rather than the merits, it should remand with instructions to dispose of the SAELC with prejudice on the merits. The question of whether Zantac can cause cancer is relevant to both standing and the merits. If Zantac is not carcinogenic, then Plaintiffs cannot prove their claimed injury that Zantac was worthless. Likewise, if Zantac is not carcinogenic, then Plaintiffs cannot succeed on their substantive claim that Zantac was misbranded because its label failed to warn of cancer risk. *See Bartlett*, 570 U.S. at 487 n.4. For this reason, if the Court views Plaintiffs' inability to put forth any admissible evidence that Zantac can cause cancer as a failure of proof on the merits, rather than a failure to prove standing, remanding with instructions to enter judgment on the merits would be proper.

As the Court explained in *Moody v. Holman*, 887 F.3d 1281, 1292 (11th Cir. 2018), where a district court erroneously dismisses based on standing instead of on the merits, the Court can affirm the dismissal but remand with instructions to convert it into a dismissal on the merits with

prejudice. Here, the district court found the failure to prove that Zantac causes cancer and was worthless meant Plaintiffs lacked standing to proceed. Standing & Summary Judgment Order, MDL.Dkt.6795:28-29. In doing so, the district court applied a summary judgment standard, granting all inferences in favor of Plaintiffs, meaning the court's analysis (and conclusion) would have been the same had it ruled on the merits of Plaintiffs' claims. The sole distinction is that the court resolved the case *without* prejudice—rather than *with* prejudice. The distinction between a ruling on standing and the merits is a harmless "labeling error" that this Court can correct by affirming on merits grounds. *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016); *see also Moody*, 887 F.3d at 1292.[11]

## C. The District Court Provided Plaintiffs Ample Notice and Opportunity to Show Cause Why Dismissal Was Not Appropriate.

There is also no merit to Plaintiffs' argument that there were deficiencies in the district court's summary judgment process. *See*

---

[11] Neither *Moody* nor *Culverson* involved a cross-appeal. But if this Court were to conclude that a cross-appeal is necessary to allow it to convert the dismissal without prejudice to a dismissal with prejudice, Brand Defendants' conditional cross-appeal would provide that authority.

Adams.Br.36-39. Given the court's Rule 702 ruling that Plaintiffs lacked admissible evidence that Zantac can cause cancer, the court entered show-cause orders under Rule 56(f), directing Plaintiffs to explain why summary judgment should not be entered and Plaintiffs' economic-loss claims dismissed for lack of standing. First Show-Cause Order, MDL.Dkt.6484:2; Second Show-Cause Order, MDL.Dkt.6639:1.

This process was entirely proper. A district court may grant summary judgment *sua sponte* after identifying the material facts that are not in dispute and providing notice and an opportunity to respond. Fed. R. Civ. P. 56(f)(3). "So long as a party against whom judgment will be entered is given sufficient advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted, then granting summary judgment *sua sponte* is entirely appropriate." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1327 n.12 (11th Cir. 2023) (internal quotation marks omitted); *see also Artistic Ent., Inc. v. Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) (affirming *sua sponte* grant of summary judgment where "the district court had all the information necessary to rule on the legal issues, and [the appellant] raised no genuine question of material fact").

The district court went beyond what Rule 56(f) requires and gave Plaintiffs not one, but two opportunities to demonstrate why the economic-loss claims could continue. The court's detailed show-cause orders identified material facts it regarded as undisputed (namely, the lack of evidence that Zantac can cause cancer) and posited key questions for Plaintiffs to address (including how they could establish economic injury given the evidentiary record). First Show-Cause Order, MDL.Dkt.6484:23-28.

Even a cursory examination of the district court's show-cause orders dispels Plaintiffs' claims that "the district court failed to give notice that [they] needed to submit evidence in support of their standing." Adams.Br.37. Notice under Rule 56(f) is sufficient where the "judge advised [plaintiff] to marshal any evidence supporting her claim." *Smith v. St. Joseph's/Candler Health Sys., Inc.*, 770 F. App'x 523, 527 (11th Cir. 2019). The court directed Plaintiffs to "explain how their economic loss class action claims could prevail as a matter of law on the current evidentiary record in this MDL." MDL.Dkt.6484:27-28. The court also explicitly required that "Plaintiffs must address the questions outlined in this Order and ***provide the Court with evidence*** with which to

withstand summary judgment." Second Show-Cause Order, MDL.Dkt.6639:9 (emphasis added).

Plaintiffs also cannot claim that they had insufficient time to respond to the show-cause orders (26 days and 7 days, respectively), when they never objected or requested an extension from the district court. MDL.Dkt.6676:12-13; *cf. In re Garcia*, 725 F. App'x 911, 913 (11th Cir. 2018) (affirming dismissal where plaintiff failed to meet a briefing deadline and never sought an extension of time). In any event, courts have repeatedly found one or two weeks sufficient for Rule 56(f) responses. *See, e.g., Swain v. Credit One Bank, N.A.*, No. 17-CV-00751, 2019 WL 10837767, at *2 (N.D. Ga. June 4, 2019) (14 days); *Johnson v. Owens*, 612 F. App'x 707, 718 (5th Cir. 2015) (14 days); *Moore v. Equitrans, L.P.*, 27 F.4th 211, 226 n.10 (4th Cir. 2022) ("seven days was sufficient" where plaintiffs "actually responded"). Plaintiffs here had approximately two months after the district court's first show-cause order cited Rule 56 and identified undisputed facts.

Neither of the cases Plaintiffs cite are remotely analogous. Adams.Br.38-39. In *Oahn Nguyen Chung v. StudentCity.com, Inc.*, the court addressed a scenario where the plaintiff was denied the opportunity

to conduct discovery into the disputed issue. 854 F.3d 97, 104-05 (1st Cir. 2017). And in *Massey v. Congress Life Ins. Co.*, the district court ignored the mandatory 10-day notice period required by the text of then-Rule 56(f). 116 F.3d 1414, 1417-18 (11th Cir. 1997).

Plaintiffs fail to show any error in the district court's summary judgment procedure.

## II. Plaintiffs Waived, Forfeited, and Failed to Plead Other Theories of Economic Injury.

As the district court correctly observed, "Plaintiffs' theory of standing based on misbranding [wa]s the only theory [on which Plaintiffs relied] in over three years of litigation." Standing & Summary Judgment Order, MDL.Dkt.6795:12. This theory "rest[ed] on the contention that [Zantac] could cause cancer … and was worthless." MDL.Dkt.6795:18. Despite this, Plaintiffs' opening brief suggests their claims may survive based on alternate theories of standing and liability—namely, based on the conclusory assertion that trace quantities of NDMA in Zantac rendered it "adulterated" and diminished its value for reasons unrelated to cancer risk. Adams.Br.33,42.

Plaintiffs, however, did not plead these claims and then expressly disavowed them. On appeal, they have failed to address the district

court's finding of waiver. In short, Plaintiffs have triply abandoned these arguments, a dispositive barrier to their appeal. Moreover, it is undisputed that Plaintiffs did not request amendment of the SAELC to add such claims when the court gave them an opportunity to do so. And, if that were not enough, the district court correctly found that such a significant amendment and change in theory, years into the litigation and after the close of discovery, would unfairly prejudice Brand Defendants, lack good cause, and be futile.

## A.   Plaintiffs Do Not Challenge the District Court's Correct Conclusion That They Failed to Plead Price-Premium Claims and Expressly Disavowed Them.

The district court did not abuse its discretion in finding that Plaintiffs affirmatively waived and forfeited their new theories during the litigation and while responding to the show-cause orders. Standing & Summary Judgment Order, MDL.Dkt.6795:17-18.

Plaintiffs' failure to challenge these findings in their opening brief constitutes another forfeiture of these arguments. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Plaintiffs' single footnote (Adams.Br.33 n.7) with the undeveloped assertion that the district court's findings of waiver were incorrect is not enough to

preserve the issue. *See Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1120 n.7 (11th Cir. 2020) (recognizing as forfeited undeveloped arguments "raised only in a footnote").[12]

With no response to the district court's conclusion that they affirmatively abandoned these theories, Plaintiffs resort to sidestepping. They suggest that the "quantity of harm is irrelevant to injury" and claim that they sufficiently alleged injury based on the "safety, or perceived safety, of Zantac in general." Adams.Br.33,42 (internal quotation marks omitted). But whether or not a plaintiff *might* allege economic injury based on such a price-premium theory, Plaintiffs *did not* plead or present that theory below—indeed, they disavowed it—and Plaintiffs cannot re-plead on appeal.

Accordingly, even setting aside Plaintiffs' failure to properly raise the waiver issue in their opening brief, the district court got it right: Plaintiffs expressly committed to a single theory that Zantac was worthless because it caused cancer and disavowed a "worth less" claim of

---

[12] In any event, the footnote—which cites Plaintiffs' opposition to a motion to dismiss by the Generic (not Brand) Defendants that predated the operative complaint—does not establish that they pleaded or preserved an adulteration claim in the SAELC. Adams.Br.33 n.7.

economic injury. Standing & Summary Judgment Order, MDL.Dkt.6795:17-18. When the district court sought clarification on whether the Plaintiffs were seeking a refund for the full or partial value of Zantac, Plaintiffs responded by confirming that their "position is that this particular product was worth zero," stating: "I will commit this is not a price premium case." MDL.Dkt.3682:189-90. Plaintiffs' counsel emphasized that *we are saying it as one word, it is worthless.* MDL.Dkt.3682:190 (emphasis added).

Plaintiffs' waiver of the claim that Zantac is unsafe for reasons other than its alleged cancer risk was equally explicit. Plaintiffs countered Brand Defendants' motion to dismiss for lack of standing by proclaiming that the "'fundamental premise' of their claims was that the ranitidine 'label needed to warn about the risk of NDMA and cancer.'" Standing & Summary Judgment Order, MDL.Dkt.6484:15 (quoting MDL.Dkt.3325:14-15). This reflects Plaintiffs' emphasis on cancer risk in the SAELC, where the word "cancer" appears more than a thousand times. MDL.Dkt.6795:16.

Furthermore, the district court's show-cause orders asked Plaintiffs to articulate their proposed new theory of economic injury based on

adulteration and non-cancer harms. The court specifically asked how they could pursue such a theory when the "core allegation in the SAELC is that ranitidine causes cancer." MDL.Dkt.6484:18. "Plaintiffs did not respond to this question." Second Show-Cause Order, MDL.Dkt.6639:4-5. Accordingly, the district court again asked Plaintiffs to explain their non-cancer adulteration theory, including asking them to "inform the Court where in their pleadings they have pled such a theory and in what filings they have pursued such a theory." *Id.* Plaintiffs did not respond except to assert that their existing "allegations incorporate[d] the theory." MDL.Dkt.6676:10. This was rightly rejected by the district court, which observed that Plaintiffs "provided no citations to the SAELC for the proposition that they previously pled that ranitidine is worthless for some reason other than cancer causation," and "neither the SAELC nor the Plaintiffs' prior representations to the Court [we]re compatible with an adulteration theory." Standing & Summary Judgment Order, MDL.Dkt.6795:20.

This Court has been unequivocal that waiver forecloses appeal: "If a party waives an argument in the district court, we will not review it on appeal." *Islam v. Sec'y, Dep't of Homeland Sec.*, 997 F.3d 1333, 1343 (11th

Cir. 2021) (internal quotation marks omitted). This reflects bedrock principles of our judicial system. As the Supreme Court has explained, "[i]n our adversarial system of adjudication, we follow the principle of party presentation ... we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (vacating Ninth Circuit judgment that relied on arguments not initially presented by parties) (internal quotation marks omitted). As a result, "it is an 'abuse of discretion' for a court 'to override a party's deliberate waiver.'" *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (quoting *Wood v. Milyard*, 566 U.S. 463, 472-73 (2012)).

The district court did not err in finding that Plaintiffs limited their theory of injury to arguing that Zantac was carcinogenic, misbranded, and therefore worthless. Standing & Summary Judgment Order, MDL.Dkt.6795:5. And, given Plaintiffs' lack of reliable evidence that Zantac increases the risk of cancer, they cannot show injury or prove the elements of their claim.

**B.  After Failing to Plead Price-Premium Claims Based on Adulteration, Plaintiffs Did Not Meet the Standard for Late-Stage Amendment.**

The district court determined that, having failed to plead price-premium claims based on adulteration, "Plaintiffs' pursuit of that theory [would] only be viable through amendment," but that amendment was foreclosed on multiple grounds—including Plaintiffs' refusal to seek it. MDL.Dkt.6795:20; *see* MDL.Dkt.6676:10 (asserting no need to amend the SAELC). The court further explained that, even if requested, it would deny amendment because the filing of a fourth economic-loss complaint, after discovery closed, would unfairly prejudice Brand Defendants and lack good cause. *See* MDL.Dkt.6795:21.

On appeal, Plaintiffs do not challenge these conclusions. Plaintiffs make no effort to address their own refusal to seek amendment at the show-cause stage. Nor do they suggest any error in the court's determination that further amendment, if requested, would have been properly denied. And because Plaintiffs make no attempt to challenge these conclusions, which supplied the court's primary grounds for rejecting their adulteration theory, this Court can simply affirm.

In any event, the district court was well within its discretion to find that a fourth complaint, coming years after discovery closed, would be improper. To amend a pleading after the deadline for amendment has passed, Rule 16 requires a party to "show good cause why leave to amend the complaint should be granted." *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1366 (11th Cir. 2007). "If a party was not diligent, the good cause inquiry should end." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417 (11th Cir. 1998) (internal quotation marks omitted). The "failure properly to amend a complaint after repeated opportunity to do so … constitutes grounds to deny a motion to amend." *Stevens v. Gay*, 864 F.2d 113, 116 (11th Cir. 1989).

No good cause exists here to permit Plaintiffs yet another bite at the apple. The district court correctly found that their adulteration theory diverges so significantly from the pleadings that it would require a *fourth* amended complaint. Standing & Summary Judgment Order, MDL.Dkt.6795:20. As the court observed, Plaintiffs "had years to plead a theory of recovery (or standing theory) that is not based on cancer or safety and have not done so." MDL.Dkt.6795:21. Their failure to do so resulted from their misplaced belief that they could show Zantac was

"misbranded" because its label failed to disclose that it could cause cancer and contained dangerous and carcinogenic levels of NDMA. Despite 116 depositions of the named putative class action plaintiffs and their healthcare providers, Plaintiffs did not present during the show-cause process any testimony from any named plaintiff stating that they would not have purchased Zantac due to any purported harm unrelated to cancer. The district court properly concluded that Plaintiffs are not entitled to a fourth chance to relitigate their claims, after fact discovery had closed. *See* MDL.Dkt.6795:21-25.

## C. Even If Plaintiffs' Adulteration Claims Had Been Pleaded and Preserved, They Are Not Viable.

Plaintiffs' adulteration claims are not viable because Plaintiffs never sought to establish that trace amounts of NDMA unconnected to cancer risk rendered Zantac worthless or that there is a viable, non-preempted state-law claim that parallels the federal adulteration statute under these circumstances.

It is undisputed that the FDA never determined that Zantac was adulterated under federal law. Plaintiffs' theory of adulteration is thus contingent on establishing a violation of the adulteration provision in the FDCA notwithstanding the absence of an FDA finding. For all the

reasons given by the district court, however, Plaintiffs could not establish that Zantac was adulterated under federal law based on the evidence in this MDL. Standing & Summary Judgment Order, MDL.Dkt.6795:21-25.

Consider Plaintiffs' difficulty even articulating their "adulteration" theory: The district court directed Plaintiffs to explain "in plain terms what constitutes an adulterated drug under the FDCA and whether and how they have put forward evidence that [Zantac] was adulterated under that standard." First Show-Cause Order, MDL.Dkt.6484:20. Plaintiffs' "inconsistent and incomplete" response implied that they believed Zantac was adulterated because Brand Defendants violated current Good Manufacturing Practices ("cGMPs"). Standing & Summary Judgment Order MDL.Dkt.6795:14 (citing MDL.Dkt.6589). After years of discovery on manufacturing and other areas, however, Plaintiffs did not explain how, much less provide any evidence that, Zantac's manufacturers strayed from cGMPs.

That is not surprising because Plaintiffs did not allege that the presence of NDMA in Zantac was the result of external contamination, but rather claimed NDMA was an inherent byproduct of the breakdown of Zantac's FDA-approved active ingredient. MDL.Dkt.6795:22-23. In its

show-cause orders, the district court repeatedly gave Plaintiffs the chance to explain, based on "the record evidence in this MDL," how Zantac could be "adulterated" if it "cannot be decontaminated through better manufacturing, better transportation, etc." MDL.Dkt.6795:23. They could not do so then, and they cannot do so now.

Nor can Plaintiffs establish an adulteration violation merely by asserting that Zantac deviated from an unspecified standard of quality or purity. MDL.Dkt.6795:21-22. At summary judgment, even assuming they had pleaded non-preempted claims, Plaintiffs were required to point to specific standards of strength and purity that Zantac failed to meet and to present evidence supporting such a claim. They did neither.

Plaintiffs also cannot point to admissible evidence showing that Zantac was contaminated with unsafe levels of NDMA, because the district court determined that the testing conducted by their experts was unreliable and inadmissible. *See, e.g.*, MDL.Dkt.6120:158. Despite the district court twice prompting them to do so, Plaintiffs made no argument and provided no authority for the retroactive application of the FDA's acceptable daily intake guidelines to the vast majority of Plaintiffs who

purchased Zantac before the guidelines were established in 2019. Standing & Summary Judgment Order, MDL.Dkt.6795:22.

Lastly, even if Plaintiffs could theoretically argue that the presence of NDMA unconnected to cancer risk constitutes adulteration of Zantac, their claims would still be preempted. Because Zantac could not be reformulated without FDA approval, the crux of such a claim would be that Brand Defendants should have modified Zantac's labeling to include a warning about the adulteration. However, manufacturers are permitted to employ the Changes Being Effected ("CBE") process to amend an FDA-approved label only when there is "newly acquired information" indicating a safety risk that is more frequent, severe, or significant than what was previously reported to the FDA. 21 C.F.R. § 314.70(c)(6)(iii)(A). The district court's Rule 702 order forecloses Plaintiffs' argument that Brand Defendants could have utilized the CBE process to update Zantac's label to reflect the potential for trace levels of NDMA: If there is no admissible evidence that Zantac can cause the harm Plaintiffs alleged, then no new safety information exists. *See, e.g.*, *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d at 1029

(holding label change was impossible absent evidence of general causation).

For all these reasons, this Court should affirm the district court's decision that Plaintiffs were not entitled to amend their claims to include an adulteration theory. MDL.Dkt.6795:21.

## III. Plaintiffs Conceded Their Medical-Monitoring Claims Were Not Viable Because There Was No Evidence That Zantac Can Cause Cancer.

Plaintiffs concede that if the district court's Rule 702 ruling is correct, then their medical-monitoring claims are not viable because they lack reliable evidence that Zantac increases the risk of cancer. Adams.Br.44-45. Without reliable evidence of significantly increased risk, courts dismiss medical-monitoring claims. *See Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1243-44, 1250-51 (11th Cir. 2018); *Garrett-Alfred v. Facebook, Inc.*, 540 F. Supp. 3d 1129, 1143 (M.D. Fla. 2021).

Plaintiffs identified five designated cancers as diseases with elevated risks due to Zantac use. Standing & Summary Judgment Order, MDL.Dkt.6795:7. Plaintiffs agreed that to bring medical-monitoring claims, they needed to show "a significant increase in their risk of

cancer—a risk significant enough that a treating physician would prescribe" medical monitoring. MDL.Dkt.3720:22. Yet, in its Rule 702 order, the district court found a lack of reliable evidence that Zantac increased the risk of developing the five designated cancers. Rule 702 Order, MDL.Dkt.6120:19.

After failing to substantiate their claim that Zantac increased the risk of the designated cancers, Plaintiffs did not try to present any evidence that Zantac increased the risk of other, non-designated cancers. Standing & Summary Judgment Order, MDL.Dkt.6795:7 (citing MDL.Dkt.6299). As the district court correctly observed, Plaintiffs renounced any intention to present general causation evidence, aside from that which the district court had deemed unreliable. *Id.*

This lack of reliable evidence that Zantac increases the risk of developing the designated cancers is fatal to Plaintiffs' medical-monitoring claims, as the district court correctly found. MDL.Dkt.6795:9-10. Plaintiffs themselves did not dispute this in the district court. *Id.* Rather, Plaintiffs' challenge on appeal rests solely on the argument that the district court abused its discretion by excluding the opinions of their general causation experts. Adams.Br.44-45. The district court's Rule 702

order, however, was justified for all the reasons stated in the Brand Defendants' brief in *Krause*, which is incorporated here by reference. As a result, the Court should affirm the dismissal of Plaintiffs' medical-monitoring claims.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's dismissal of the economic-loss and medical-monitoring actions.

## CONDITIONAL CROSS-APPEAL
## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over the economic-loss class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this conditional cross-appeal arises from a final order and final judgment entered on July 26, 2023. Standing & Summary Judgment Order, MDL.Dkts.6795 Brand Defendants filed a timely notice of conditional cross-appeal on September 5, 2023. MDL.Dkt.6948.

## CONDITIONAL CROSS-APPEAL
## SUMMARY OF ARGUMENT

This Court need not address Brand Defendants' cross-appeal if it affirms the district court's dismissal of the economic-loss class action. If the Court should reach Brand Defendants' conditional cross-appeal, it should hold that express and implied preemption barred all of Plaintiffs' "misbranding" claims from the start.

State-law claims that target OTC medications are barred by the express preemption provision contained in 21 U.S.C. § 379r unless they either parallel federal law or satisfy one of that statute's exceptions. By

enacting Section 379r, Congress *expressly* preempted state-law economic-loss claims challenging the safety, efficacy, design, or labeling of FDA-approved OTC products. Meanwhile, through Section 337(a) as applied in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348-53 (2001), Congress *impliedly* preempted private claims seeking to enforce federal regulations.

Here, Plaintiffs shaped their economic-loss claims to avoid express preemption and focused their entire strategy on language about misbranding contained in footnote 4 of *Bartlett*. That footnote suggested that an approved drug could become "misbranded," which would require the drug's withdrawal from the market if information undisclosed to the FDA indicates the drug is "dangerous to health," even when "used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." *Bartlett*, 570 U.S. at 487 n.4 (quoting 21 U.S.C. § 352).

To squeeze into this narrow potential exception to express preemption, Plaintiffs alleged that, "when the FDA approved ranitidine, it did not have full and accurate information about ranitidine because, at that time, the Defendants had withheld information about the dangers

of ranitidine from the FDA," including the risk of NDMA formation. *See* MDL.Dkt.3715:31. Plaintiffs asserted that, had Brand Defendants disclosed information about the risk of NDMA formation to FDA, the agency would not have approved OTC Zantac or would have required OTC Zantac to be removed from the market. *See, e.g.*, MDL.Dkt.3883¶¶305-11,359-60. That is the only allegation that the district court found survived express preemption. MDL.Dkt.3715:36 ("The Court therefore grants the Defendants' Motion in part insofar as any OTC claim not based upon a false or misleading label is dismissed with prejudice as pre-empted.").

A straightforward application of the Supreme Court's decision in *Buckman* and this Court's opinion in *Mink* demonstrates that these remaining claims against Brand Defendants were barred by *implied* preemption. In *Mink*, this Court applied the reasoning in *Buckman* to hold that federal law impliedly preempted a state-law negligence claim based on failure to report information about a medical device to the FDA. 860 F.3d at 1330. There, as here, such failure-to-warn claims necessarily hinge upon the allegation that the defendants hid information from the FDA and, thus, deceived the agency. *See id.*; MDL.Dkt.3715:32.

Accordingly, even if this Court were inclined to modify or reverse the district court's rulings (it should not), the judgment should still be affirmed because Plaintiffs' economic-loss claims for OTC Zantac are barred by federal preemption.

## CROSS-APPEAL ARGUMENT

Very few economic-loss claims involving OTC drugs survive the "narrow gap" between express and implied preemption. *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1327 (11th Cir. 2017) (internal quotation marks omitted). As then-Judge Gorsuch observed, "[i]t's no wonder that the difficulty of crafting a complaint sufficient to satisfy all these demands has been compared to the task of navigating between Scylla and Charybdis." *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1340 (10th Cir. 2015). Although the district court found Plaintiffs' claims premised on alleged "misbranding" of Zantac survived express and implied preemption, these claims never should have gotten past the pleadings. They intrude on the exclusive role of the FDA in enforcing the FDCA, including the misbranding law. And they would have required proof that Brand Defendants failed to disclose information to the FDA—a "fraud-on-the-FDA" theory that is barred by implied preemption.

## I. Express Preemption Barred Plaintiffs' Economic-Loss Claims.

Plaintiffs' economic-loss claims were expressly preempted because they sought to impose state-law obligations that were not identical to FDA regulations governing the manufacture, labeling, marketing, and sale of OTC Zantac. These claims directly contravened the judgment of FDA that OTC Zantac was safe and effective as labeled for use. Since the first approval of 75mg OTC Zantac in 1995, FDA has reviewed and reaffirmed that OTC Zantac was safe and effective as labeled on multiple occasions and through multiple New Drug Applications ("NDAs"). Had they made it past summary judgment, Plaintiffs' economic-loss claims challenging the safety and efficacy of Zantac would have required a jury to make the opposite determination, *i.e.*, that Zantac was not safe as marketed under the FDA-approved labels and other conditions of FDA-approved NDAs. Such an outcome was not simply "at variance with FDA regulations"; it would obliterate them. *Carter*, 582 F. Supp. 2d at 1283.

To achieve "[n]ational uniformity for nonprescription drugs," Section 379r contains a broad express preemption mandate. It preempts any state-law claim related to an OTC medication that imposes state-law requirements "different from," "in addition to," or "not identical with"

federal requirements. This provision allows only claims that exactly "parallel" federal law to proceed, meaning the claim must allege injury caused by conduct that violates *both* federal *and* state laws. *See Riegel*, 552 U.S. at 321-25 (explaining that these provisions mean that, absent a deviation from federal requirements that caused plaintiffs' injury, state-law claims challenging federally approved design, manufacture, or labeling are expressly preempted).[13]

Courts have repeatedly found Section 379r preempts similar claims grounded in the allegation that an OTC medication was not safe and effective. *See, e.g.*, *Carter*, 582 F. Supp. 2d at 1290; *Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780, 791-95 (Cal. Ct. App. 2002). In *Carter*, the court held Section 379r expressly preempted all economic-loss class action claims against manufacturers of OTC cough and cold medicines, finding that Section 379r did not permit claims "that [the defendants']

---

[13] The Supreme Court in *Riegel* interpreted the near-identical express preemption provision in the Medical Device Amendments ("MDA") to the FDCA, 21 U.S.C. § 360k(a), which bars states from imposing requirements on certain FDA-approved medical devices that are "different from, or in addition to" the requirements under federal law. The preemption principles the Court described for express and implied preemption under the MDA have full application here.

statements [were] false and misleading in light of the fact that OTC cough and cold medicines d[id] not work and [were] dangerous to young children." 582 F. Supp. 2d at 1276-77, 1284, 1290; *see also Faustino v. Alcon Labs., Inc.*, No. 15-CV-04145, 2015 WL 12839161, at *2-3 (C.D. Cal. Sept. 22, 2015), *aff'd on other grounds*, 692 F. App'x 819 (9th Cir. 2017); *see also Kanter*, 99 Cal. App. 4th at 796 (holding Section 379r preempted consumer class claims against manufacturers of OTC head lice medication because "the legal theories underlying these causes of action" were "bottomed on the assertion that th[e] approved label [was] no longer accurate or adequate and that the label should be changed or the product banned").

Brand Defendants argued, and the district court agreed, that express preemption is applicable regardless of whether Plaintiffs argued that the companies should have used a different design, different labeling (including different marketing or advertising materials), or different manufacturing processes than that required by federal law. However, after their claims were dismissed in the first round of motions to dismiss, Plaintiffs embraced the "misbranding" theory raised by FDA in an amicus brief in *Bartlett* and discussed in dicta in a footnote. *Bartlett*, 570

U.S. at 487 n.4 (making clear it was "not address[ing]" a misbranding claim). Even though the "misbranding" theory was unrecognized and unprecedented, Plaintiffs pursued it as their only option to side-step express preemption.

As an initial matter, it is inconsistent with Section 379r to allow a private litigant to claim that the FDA-approved drug label is criminally misbranded where the FDA itself has never made that determination and where the claim amounts to second-guessing the FDA's determinations regarding safety, efficacy, and the propriety of the product's label. No court had previously recognized a parallel claim based on purported "misbranding," for good reason: It is illogical to claim a medication is "misbranded" on the theory that its FDA-approved formulation and label are "dangerous." That claim flips the federal misbranding law on its head. Under federal law a manufacturer *must adhere to* the FDA approved label because a unilateral departure from that label, absent special circumstances, could render the product misbranded. *See* 21 C.F.R. § 201.66 (establishing the format and content of OTC drug product labeling with reference to the approved drug application); 21 U.S.C. § 355(a) (prohibiting introduction of unapproved new drugs). It is a

deviation from the approved label, not fealty to it, that could constitute misbranding. Indeed, the district court here recognized that "[s]ubsequent to *Mensing*, courts have universally rejected misbranding-based arguments as a means to avoid impossibility pre-emption, citing the express finding of the Supreme Court and the implicit reasoning therein." MDL.Dkt.3715:24.

The district court nonetheless found that Plaintiffs' "misbranding" theories could survive preemption based on the Supreme Court's comment in *Bartlett* footnote 4. That footnote suggested a rare instance where "new evidence," not previously available to the FDA, "rendered [the product] so dangerous" that it was misbranded under federal law. 570 U.S. at 487 n.4. This uncommon situation requires a manufacturer to withdraw an FDA-approved drug from the market if it is "dangerous to health," even when used as prescribed on the label. *Id.* (quoting 21 U.S.C. § 352(j)). In noting this possibility, the Supreme Court in *Bartlett* footnote 4 was merely responding to, and not reaching, a hypothetical misbranding issue raised in the government's amicus brief. As a result, it "is not clear whether this language implies that an exception for

'parallel misbranding' claims actually exists." *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 929 (6th Cir. 2014).

## II. Even If "Misbranding" Claims Survived Express Preemption, They Were Impliedly Preempted.

The only narrow claim the court found survived express preemption was one premised on Brand Defendants' alleged failure to provide safety information to the FDA—a core allegation that runs straight into implied preemption.

The district court described the pleadings that made out a "parallel" misbranding claim as follows:

> (i) [Plaintiffs] have alleged the Defendants withheld information about [Zantac's] propensity to form NDMA from the FDA, (ii) they have alleged that the FDA recently learned about [Zantac's] propensity to form NDMA, and (iii) they have alleged that the FDA issued a voluntary recall of [Zantac] as a result of its receipt of that information.

MDL.Dkt.3715:32. The court added:

> the Plaintiffs have alleged that, if the FDA had the information in the past that the FDA possesses in the present, the FDA never would have permitted ranitidine to be sold. Stated another way, it is the Plaintiffs' allegation that [Zantac] should never have been approved for OTC status, and were therefore misbranded, because the FDA-approved label was false and misleading and caused harm

when taken as directed due to the Defendants'
deception.

*Id.*[14] The district court's analysis demonstrated that the only allegations

that paralleled federal misbranding law, and thus escaped *express*

preemption, were claims that the FDA-approved label was "false and

misleading" due to information allegedly withheld from the FDA during

the approval process. Such claims, however, are impliedly preempted.

In *Mink*, this Court held that under *Buckman* federal law impliedly

preempts "failure to warn" claims based on a defendant's purported

failure to provide sufficient information to the FDA. 860 F.3d at 1327-30.

---

[14] Plaintiffs made numerous allegations regarding Brand Defendants'
alleged failures to make fulsome and timely disclosures to FDA.
MDL.Dkt.3883¶¶305-11 ("Defendants failed to report these risks to the
FDA."). Plaintiffs cited annual reporting obligations, MDL.Dkt.3883¶307
(citing 21 C.F.R. § 314.81(b)(2)), and FDA's reliance on manufacturers "to
bring new information about an approved drug like ranitidine to the
agency's attention," MDL.Dkt.3883¶306. Plaintiffs further contended
that Brand Defendants violated federal regulations by purportedly
failing to include information about NDMA formation and risks in
submissions to the FDA. MDL.Dkt.3883¶305 (alleging that Defendants
failed to report to the FDA that "ranitidine exposed users to unsafe levels
of NDMA"). Those claims sought to enforce federal regulations that
require submission of risk information in connection with an NDA, 21
C.F.R. § 314.50, to supplement that risk information to FDA after
approval, *id.* §§ 314.80-81, and to change a product label under certain
circumstances, *id.* § 314.70.

In that case, the plaintiff allegedly experienced abnormal levels of chromium and cobalt in his blood, which he attributed to his hip replacement system and the manufacturers' failure to "adequately investigate adverse events and complaints and fail[ure] to properly report these issues to the FDA." *See id.* at 1323-24, 1330. The plaintiff argued that his state common-law claim was merely parallel to federal requirements, but this Court flatly rejected that contention. *Mink*, 860 F.3d at 1330. The Court reasoned that the plaintiff's "theory of liability [was] based on a duty to file a report with the FDA" and was "very much like the 'fraud-on-the-FDA' claim the Supreme Court held was impliedly preempted in *Buckman*." *Id.* The Court held, moreover, that even if Florida law recognized "the common law duty" to warn FDA "as a basis for a negligence claim," such claims are still preempted because they are based in part on the manufacturer's alleged failure to report known or knowable safety information to the FDA, which is not within the traditional province of state law. *See id.* at 1329-1330.

This Court has repeatedly applied and reaffirmed *Mink* and found that implied preemption forecloses similar efforts by individuals to enforce FDA-reporting requirements and other FDCA regulations. *See,*

*e.g.*, *Markland v. Insys Therapeutics, Inc.*, 758 F. App'x 777, 779-80 (11th Cir. 2018) (per curiam) (holding plaintiff's claim "styled as a 'negligent marketing' claim" was impliedly preempted where "the substance of [plaintiff's] complaint" was that the manufacturer "violated federal law" that prohibited off-label marketing); *Tsavaris v. Pfizer, Inc.*, 717 F. App'x 874, 877 (11th Cir. 2017) (per curiam) (federal law preempts plaintiff's claim that drug manufacturer "was negligent for failing to fulfill its duty to report findings about its product to the [FDA]" and thereby "seeks to enforce a duty owed to a federal agency" without which, "her cause of action would not exist").

Other courts have squarely rejected similar efforts to thread the "narrow gap" between express and implied preemption "merely by being recast as violations of the federal adulteration and misbranding statutes." *Parker v. Stryker Corp.*, 584 F. Supp. 2d 1298, 1301 (D. Colo. 2008). Courts have explained such arguments "must fail," because "violations of the FDCA do not create private rights of action" and "only the government has a right to take action with respect to adulterated [or misbranded] products." *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 544 (3d Cir. 1994); *see also Franklin v. Medtronic, Inc.,* No. 09-CV-02301,

2010 WL 2543579, at *8 (D. Colo. May 12, 2010), *report and recommendation adopted*, 2010 WL 2543570 (D. Colo. June 22, 2010) ("[T]o the extent that Plaintiff seeks to ground her negligence per se and misrepresentation claims on allegations that Defendants violated the FDCA—namely, by selling a misbranded and adulterated product—these claims are impliedly preempted pursuant to 21 U.S.C. § 337(a).").

Here, Plaintiffs' claims of purported "misbranding" hinge on their allegation that Brand Defendants failed to provide safety information to the FDA, which Plaintiffs contend rendered the OTC Zantac label "false and misleading." MDL.Dkt.3715:36. These claims are no different than the preempted claims in *Mink* and in the many other cases finding implied preemption of fraud-on-the-FDA-style claims. Just as in *Mink* and *Buckman*, Plaintiffs impermissibly sought to hold Brand Defendants liable for failing to provide federally required product-safety information to the FDA.

In addition to relying on unavailable fraud-on-the-FDA theories, Plaintiffs' claims are impliedly preempted because they rely on the improper and speculative inference that, had Brand Defendants disclosed additional information to the FDA, OTC Zantac would not have

received FDA approval as safe and effective. *See, e.g.*, MDL.Dkt.3883¶¶305-09. This is a variant of the "stop-selling" rationale the Supreme Court rejected in *Bartlett*, 570 U.S. at 488, and *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623 (2011). Plaintiffs' theory of liability intrudes into discretionary recall decisions committed exclusively to FDA, not to private litigants. *See Mensing*, 564 U.S. at 623 ("To consider in our pre-emption analysis the contingencies inherent in these cases—in which the Manufacturers' ability to comply with state law depended on uncertain federal agency and third-party decisions—would be inconsistent with … the Supremacy Clause."). Even to date, the FDA has not found Zantac misbranded or adulterated, and has not revoked Zantac's NDA; rather, in 2019 the then-existing manufacturers voluntarily withdrew Zantac.

In allowing these claims to proceed past the pleadings, the district court recognized the substantial constraints that federal preemption imposes on Plaintiffs' claims. Nonetheless, following the third round of motions to dismiss, the court declined to resolve whether preemption was dispositive at the pleadings stage. Instead, the court noted it "did not need to resolve the question of the correct definition of misbranding," and

asserted it "did not conclude that the Plaintiffs' OTC refund claims were limited to a theory that the Brands withheld information about ranitidine from the FDA," because it "deferred" a final ruling on the scope of express preemption "until such time as it considers state-specific arguments." MDL.Dkt.4487:14.

The district court should have dismissed Plaintiffs' claims for the same reason as the claims in *Mink* and *Buckman*. At bottom, Plaintiffs' economic-loss claims were grounded in the allegation that the Brand Defendants failed to submit information to the FDA, reflected an impermissible effort to enforce the FDCA's misbranding requirements, and intruded on the FDA's exclusive authority to police these issues. This Court should not permit "misbranding" claims as an exception to federal preemption for these compelling reasons.

## CROSS-APPEAL CONCLUSION

For the foregoing reasons, if this Court does not affirm the district court's decision to dismiss the economic-loss class claims, the Court should reverse the district court's rulings on federal preemption, MDL.Dkt.4487, hold that Plaintiffs' OTC claims are barred, and remand with instructions to dismiss these economic-loss claims with prejudice.

Dated: July 25, 2024

Respectfully submitted,

Jay P. Lefkowitz
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Cole Carter
KIRKLAND & ELLIS, LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-1951

*Counsel for GlaxoSmithKline
LLC, GlaxoSmithKline
Holdings (Americas) Inc.,
and GlaxoSmithKline PLC*

Joseph G. Petrosinelli
Amy Mason Saharia
Anne E. Showalter
Libby Baird
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, D.C. 20024
(202) 434-5000

*Counsel for Pfizer Inc.*

/s/ Ilana H. Eisenstein
Ilana H. Eisenstein
Rachel A.H. Horton
M. David Josefovits
DLA PIPER LLP (US)
1650 Market St., Ste. 5000
Philadelphia, PA 19103
(215) 656-3300

Samantha L. Chaifetz
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
(202) 799-4082

Daniel S. Pariser
Sally L. Pei
ARNOLD & PORTER
 KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000

*Counsel for Sanofi-Aventis U.S.
LLC, Sanofi US Services, Inc.,
and Chattem, Inc.*

Paul Alessio Mezzina
Joshua N. Mitchell
Mathew Noller
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Suite 900
Washington, D.C. 20006
(202) 626-8972

Madison Kitchens
KING & SPALDING, LLP
1180 Peachtree St., N.E.
Suite 1600
Atlanta, GA 30309
(404) 572-2712

*Counsel for Boehringer
Ingelheim Pharmaceuticals,
Inc., Boehringer Ingelheim
Corporation, and Boehringer
Ingelheim USA Corporation*

Steven Reitenour
BOWMAN AND BROOKE LLP
150 S. 5th St., Ste. 3000
Minneapolis, MN 55402
(612) 672-3244

*Counsel for Patheon
Manufacturing Services LLC*

# CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this Brief complies with the Type-Volume Limitation, Typeface Requirements, and Type-Style Requirements:

1.     This document complies with the word limit requirement of Federal Rule of Appellate Procedure 28.1(e)(2)(B) because it contains 15,293 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in roman style typeface of 14 points.

Dated: July 25, 2024                    */s/ Ilana H. Eisenstein*
                                        Ilana H. Eisenstein

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2024, I caused the foregoing Brief to be filed using the appellate CM/ECF system with the Clerk of Court, and that four copies of this brief are being delivered via third-party commercial carrier to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit.

I further certify that all participants in the case are registered CM/ECF users, and that service will be accomplished via the appellate CM/ECF system.

Dated: July 25, 2024                    */s/ Ilana H. Eisenstein*
                                        Ilana H. Eisenstein